UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RECEIPT # 58898
AMOUNT $ 150
SUMMONS ISSUED Y-1
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. M
DATE 9-24-04

SALOMON GREY FINANCIAL CORP.,

§
§
§

Plaintiff,

§
§

v.

§
§

CIVIL ACTION

§
§

NO. _____

DANIEL RUSSO, INDIVIDUALLY AND
AS TRUSTEE FOR AEGIS
INTERNATIONAL, INC. PROFIT
SHARING RETIREMENT PLAN,

§
§
§
§
§
§
§

Defendant

§
§

# 04  12056 NG

MAGISTRATE JUDGE Dein

## PLAINTIFF'S ORIGINAL COMPLAINT AND MOTION TO VACATE OR IN THE ALTERNATIVE TO MODIFY OR CORRECT AWARD OF ARBITRATION

Salomon Grey Financial Corporation ("SGFC") requests that this Court issue an Order vacating, or in the alternative, remanding for correction, an arbitration award in favor of Daniel Russo, Individually, and as Trustee for Aegis International, Inc. Profit-Sharing Retirement Plan (collectively "Russo") for the reasons as more fully explained below:

### I. PARTIES AND JURISDICTION

1.    Defendant Russo, the Claimant in the arbitration below, filed his Statement of Claim acting individually and as the trustee for Aegis International, Inc. Profit-Sharing and Retirement Plan, Inc. (the "Plan"). Russo resides in and is domiciled in the State of Connecticut. Statement of Claim p. 1.[1]

2.    SGFC is a brokerage firm whose principal place of business is in Dallas, Texas. SGFC was one of four (4) Respondents in the arbitration proceedings below.

---

[1] A true and correct copy of Russo's Statement of Claim (the "Statement of Claim"), without exhibits, is attached hereto as **Exhibit "A"** and is incorporated herein by reference as if set forth here in full.

PLAINTIFF'S ORIGINAL COMPLAINT AND MOTION TO VACATE OR IN THE ALTERNATIVE TO MODIFY OR CORRECT AWARD OF ARBITRATION—Page 1.

3.    SGFC, a NASD member, and Russo are parties to brokerage contracts requiring arbitration of disputes between them.[2]

4.    This Court has federal question jurisdiction over this case in that Russo alleged that SGFC violated certain federal securities laws and the court has pendent jurisdiction over the state claims.  Venue is appropriate in this Court.  *See Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193 (2000), *on remand*, 211 F.3d 1209 (11th Cir. 2000) (venue is proper either in the jurisdiction where the arbitration award was issued or pursuant to the general federal jurisdiction statute § 1391).

## FACTUAL BACKGROUND

5.    Defendant Russo, the Claimant in the arbitration below, filed his Statement of Claim acting individually and as the trustee for Aegis International, Inc. Profit-Sharing and Retirement Plan, Inc. (the "Plan").  Statement of Claim p. 1.

6.    SGFC is a brokerage firm whose principal place of business is in Dallas, Texas. SGFC, a National Association of Securities Dealers ("NASD") member, and Russo are parties to brokerage contracts that required the arbitration of disputes between them.

7.    SGFC was one of four (4) Respondents in the original arbitration proceeding below (NASD Arbitration No. 02-6557).  The other Respondents were:  Federal Street Investments, Inc., FISERV Correspondent Services, Inc., and Roger Blundell ("Blundell").  Those Respondents settled with Russo prior to the arbitration hearing.

8.    Russo, the Claimant below, brought the arbitration to recover for Blundell's alleged wrongdoing "in dealing with Mr. Russo's accounts from July 1999 to present," a

---

[2] *See e.g.*, Salomon Grey Option Application introduced at arbitration and signed by Russo.  The Option Application is attached hereto as **Exhibit "B"** and is incorporated herein by reference as if set forth here in full.

period of approximately five years. Statement of Claim p. 1. Blundell was Russo's broker. Statement of Claim p. 1. All of the other Respondents in the arbitration were firms that either employed or were affiliated with Blundell for most of the time Blundell handled Russo's accounts. Statement of Claim p. 1.

9.     Blundell only briefly worked for SGFC.   Russo's Statement of Claim admitted that SGFC's role in this lawsuit, if any, was extremely limited: "Mr. Russo agreed to transfer his accounts to Blundell's new firm, Salomon Grey Financial, on November 20, 2000. *Less than six months later*, on April 26, 2001, Blundell told Mr. Russo that he had started his own business and he wanted to move Mr. Russo's accounts to his new firm, Federal Street Investments." Statement of Claim p. 3.

10.     The arbitrators in this case issued their award in pertinent part requiring SGFC to pay compensatory damages, attorneys' fees, and certain other fees and costs associated with the arbitration (the "Arbitration Award") despite a dearth of claims against SGFC in the Statement of Claim and its status as a pass-through for Blundell's accounts for a few months.[3]

### III. BASIS FOR VACATING ARBITRATION AWARD

11.     Under 9 U.S.C. § 10 of the Federal Arbitration Act (the "FAA") a court may properly vacate an arbitration award when the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10 (d).

12.     NASD rules require that the arbitrators make a ruling as to each statutory provision they find violated.   NASD Rule 10214.

---

[3] A true and correct copy of the Arbitration Award is attached hereto as **Exhibit "C"** and is incorporated herein by reference as if set forth here in full.

PLAINTIFF'S ORIGINAL COMPLAINT AND MOTION TO VACATE OR IN THE ALTERNATIVE TO MODIFY OR CORRECT AWARD OF ARBITRATION—Page 3.

13.    The Court should vacate the Arbitration Award because the Award fails to comply with the NASD rule stating that each NASD award must contain a statement of statutory provisions violated.    Having failed to fulfill this express requirement, the arbitrators exceeded the terms of their authority.

## IV. RELIEF REQUESTED

WHEREFORE, Plaintiff asks this Court to issue an Order vacating the portion of the Arbitration Award requiring Salomon Grey to make any payment of damages to Russo and all supporting analysis on the grounds that the Award was issued in excess of the arbitrators' authority.

Respectfully Submitted,

_Patti Wasserman_
PATTI WASSERMAN
WASSERMAN & ROSENBLATT
7 Foster Street
Quincy, MA 02169
(617) 773-7221 phone
(617) 479-0006 fax
Board of Bar No. 555662

ROBBYN P. WYSOCKI
Texas State Bar No. 22115600
McCUE WYSOCKI, P.C.
14135 Midway Road, Suite 250
Dallas, Texas 75001
(972) 490-0808
(972) 490-9545 Fax

ATTORNEYS  FOR  SALOMON  GREY
FINANCIAL CORPORATION

NATIONAL ASSOCIATION OF SECURITIES DEALERS

| | |
|---|---|
| DANIEL RUSSO, INDIVIDUALLY AND AS TRUSTEE FOR AEGIS INTERNATIONAL, INC. PROFIT SHARING RETIRMENT PLAN )<br><br>Claimant, )<br><br>v. )<br><br>FEDERAL STREET INVESTMENTS, INC., FISERV CORRESPONDENT SERVICES, INC., SALOMON GREY FINANCIAL CORP. and ROGER BLUNDELL )<br><br>Respondents. ) | NASD ARBITRATION NO. |



02-08504

02-655 NY

## STATEMENT OF CLAIM

### I.    INTRODUCTION

Claimant Daniel Russo ("Russo"), individually and as trustee for Aegis International, Inc. Profit Sharing Retirement Plan, Inc. (the "Plan"), brings this claim against Respondents Federal Street Investments Inc. ("Federal Street"), Fiserv Correspondent Services, Inc. ("Fiserv"), Salomon Grey Financial Corporation ("Salomon") and Roger Blundell ("Blundell") (collectively, the "Respondents") to address the Respondents' wrongful conduct in dealing with Mr. Russo's accounts from July 1999 to present. The Respondents took advantage of Mr. Russo's trust and reliance and took control of his accounts to serve Respondents' interests rather than Mr. Russo's interests. In the process the Respondents have caused Mr. Russo and the Plan more than $660,000 in out-of-pocket damages through misrepresentations, unauthorized use of margin and options, unauthorized trading, trading in unsuitable securities, churning, negligence, gross mismanagement and failure of supervision.



RECEIVED
DEC 1 6 2002
By MRL

EXHIBIT
A

## II.    FACTS OF THE CASE

### A.    Background

Daniel Russo is 49 years old and a resident of Connecticut. He has four children. Mr. Russo has a high school education and does not have a business background. He has owned and operated an insurance investigation firm for over 20 years. The firm has nine employees.

The Aegis International, Inc. Profit Sharing Retirement Plan (the "Plan") was established in 1987. The purpose of the Plan was to provide retirement benefits for employees at Mr. Russo's company. There is an annual employer contribution of the lesser of $30,000 or 15% of member's compensation into the Plan. Each member of the Plan begins vesting in their second year of employment and they are fully vested by year six. Mr. Russo is the Trustee for the Plan and he is also a participant.

Mr. Russo realized that he needed professional assistance with his investments. Prior to his dealings with the Respondents, Mr. Russo had accounts with other brokerage firms in the early 1990's. Mr. Russo's limited investment experience with these firms consisted mostly of making long-term investments in stocks and mutual funds for himself and the Plan. Starting in or around 1993, Mr. Russo's accounts were being managed by a broker named Gerry Esposito ("Esposito"). Mr. Russo developed a good business relationship with Esposito. Mr. Russo believed Esposito understood his investment objectives. Therefore, when Esposito became an agent of Barron Chase Securities in or around May 1995, Mr. Russo transferred all his accounts to Barron Chase at Esposito's suggestion. Mr. Russo's accounts at Barron Chase included a joint account with his wife, two Uniform Gift to Minors (UGMA) accounts for his children, two separate IRA accounts for himself and his wife, a personal account, and an account for the Plan.

While the accounts were with Esposito, Mr. Russo was given to understand that the vast majority of his savings were moderately invested in mutual funds, U.S. treasuries and equities. Mr. Russo's overall goal in these accounts was to get a better return than at his bank through safe and prudent investments. His investment objective in his own accounts was to create security for his retirement and for his childrens' education. His objective for the Plan's account was to provide long-term growth for retirement for himself and his employees.

In July 1999, Gerry Esposito was about to leave Barron Chase Securities. Almost immediately, Barron Chase representative Roger Blundell began aggressively calling Mr. Russo in order to take over his accounts. After repeated calls, Blundell convinced Mr. Russo to have him as registered representative for the accounts. At the time, the accounts were performing well as far as Mr. Russo knew and were not on margin.

Blundell never asked Mr. Russo about his investment objectives or had him fill out a risk profile. Mr. Russo did inform Blundell that the money invested in these accounts was his entire personal savings and his company's profit sharing plan. Mr. Russo instructed Blundell that he was a conservative investor and that he was only willing to take minimal risks in these accounts, especially in the Plan's account. Although Mr. Russo was looking for professional advice, he informed Blundell that he wanted all trades cleared through him before they were made. Blundell made several promises and initially there were some positive returns in the accounts. Mr. Russo had confidence that Blundell was acting in his best interest.

Mr. Russo invested with Blundell at Barron Chase until November 2000. On November 21, 2000 Barron Chase filed for a Broker Dealer Withdrawal (BDW) terminating its securities registration with the NASD due to financial problems. (Blundell also never disclosed to Mr. Russo that Barron Chase had a huge number of customer complaints and regulatory actions against it and was finally expelled by the NASD.) Blundell never informed Mr. Russo that Barron Chase was in financial trouble and had closed. Blundell told Mr. Russo that he had a better opportunity with another company and asked Mr. Russo to move his accounts. Mr. Russo agreed to transfer his accounts to Blundell's new firm, Salomon Grey Financial, on November 20, 2000. Less than six months later, on April 26, 2001, Blundell told Mr. Russo that he had started his own business and the that wanted to move Mr. Russo's accounts to his new firm, Federal Street Investments. Having placed his trust in Blundell, Mr. Russo agreed to transfer his accounts with Blundell to Federal Street.

**B.    The Exploitation of Russo's Accounts**

    **1.    Unauthorized margin and option trading**

Soon after Blundell took over Mr. Russo's accounts in or around July 1999, he began to manage the accounts in a manner that not only breached his fiduciary duty to Mr. Russo, but was also unauthorized and in direct contradiction to Mr. Russo's investment objectives. For reasons never disclosed to Mr. Russo, beginning in October 1999 and thereafter, Blundell disregarded Mr. Russo's instructions and the accounts were increasingly placed on margin. Stocks were being purchased on margin without Mr. Russo's knowledge or consent. Mr. Russo never indicated to the Respondents that he wanted or needed to purchase stock on margin. Mr. Russo had no significant prior experience trading on margin. Mr. Russo had stated explicitly to Blundell from the outset that he did not want to be borrowing money in connection with the investments in his accounts. Mr. Russo informed Blundell that he had no debt at the time (i.e. no mortgage, car payment, etc.) and he did not want to start now.

Blundell never received authorization from Mr. Russo to trade on margin. In fact, Blundell traded on margin without authorization for months without a signed margin agreement. Mr. Russo had not authorized margin trading, did not want margin trading and when later given a form to approve margin, he was unwilling to sign it. Blundell and Fiserv (the clearing agent) pressured Mr. Russo to sign the form, but Mr. Russo did not want to sign it as this was contrary to his approval. Fiserv sent Mr. Russo a letter on December 8, 2000 informing him that he needed to sign the form by December 29, 2000 in order to trade. See copy of Fiserv letter attached hereto as Exhibit A. After Blundell continued to pressure him for months and assured him that the form was only part of the standard agreement and that it needed to be on file, Mr. Russo finally signed the form on April 19, 2001. See copy of margin agreement attached hereto as Exhibit B. Blundell told Mr. Russo that he was not going to trade on margin and that he had Type 2 Margin, the type of margin that was there only if you needed it.

Based on Mr. Russo's financial circumstances and objectives, the purchase of stock on margin was inappropriate and unnecessary, in addition to being unauthorized. As a result of this activity, the account exceeded margin maintenance limitations on a number of occasions, without

Mr. Russo's knowledge. Blundell never called this to Mr. Russo's attention or even mentioned it to him. It was only after Mr. Russo began receiving margin calls that he realized there was a problem. Mr. Russo promptly contacted Blundell for an explanation. Between April 2000 and September 2001, Mr. Russo placed several phone calls and sent facsimiles to Blundell requesting an explanation of the margin in the accounts. See copy of facsimiles and margin calls attached hereto as Exhibit C. Blundell denied that Mr. Russo was on margin. Blundell made several excuses and repeatedly blamed the margin calls on a clerical error or stated that it was Fiserv's mistake. Blundell assured Mr. Russo that he would take care of the problem. Giving him the benefit of the doubt, and having put his faith in Blundell, Mr. Russo kept his account with Blundell.

In January 2002, Mr. Russo began preparing his 2001 tax return with his accountant. His accountant informed Mr. Russo that he paid $15,000 in margin interest in 2001. Mr. Russo immediately contacted Blundell to inquire as to why the margin errors were not corrected as promised. At first, Blundell denied that Mr. Russo was on margin. However, Blundell finally admitted that there was margin interest of $1,500 for 2001, but again blamed it on a clerical error. Blundell insisted that he would correct the problem, but he never did. In the end, Mr. Russo was forced to pay several margin calls and $16,014 in margin interest because of the Respondents' unauthorized use of margin.

Blundell also introduced option trading into the accounts without Mr. Russo's informed authorization. Mr. Russo had never traded options. This type of trading, which resulted in significant losses, was clearly inappropriate based on Mr. Russo's background and objectives. Mr. Russo constantly asked Blundell to explain this type of trading. Blundell stated that it was a "no lose proposition" and that Mr. Russo would be able to take a premium each month off these trades. Blundell stressed that there was no risk and told Mr. Russo that he was "leaving money on the table" if he did not trade options. No option forms or agreements were signed until April 19, 2001, several months after the first option trade was placed. See option application attached hereto as Exhibit D.

### 2.    Unsuitable Trading

The Respondents mishandled the accounts by failing to diversify the portfolio into different investment areas. The accounts were over-concentrated in speculative securities that unnecessarily subjected Mr. Russo to increased levels of risk without disclosing this risk to Mr. Russo. Blundell's overall investment strategy and practices were deceptive and unsuitable. In light of Mr. Russo's investment objectives and acceptable levels of risk, a more diversified and moderate program was mandated, not to mention keeping him informed and obtaining his authorization prior to every trade. Blundell was responsible for the vast majority of stock selections. Mr. Russo seldom rejected any of Blundell's recommendations and Blundell ignored most of the suggestions that Mr. Russo made. For all practical purposes, Blundell controlled the account.

Blundell's investment choices were not in accordance with Mr. Russo's objectives for a conservative, diversified portfolio and were in stark contrast to the selections made when Esposito managed the accounts. When Blundell took over the accounts at Barron Chase, there were only a few equities, such as Disney and AOL, several mutual funds and U.S. Treasuries in the portfolio. Blundell sold off many of Mr. Russo's investments in well-established companies such as Disney, a stock in which Mr. Russo realized a good profit. Blundell also sold most of the mutual funds. Some of the funds had contingent deferred sales charges. When Mr. Russo found out about the sales charges, he promptly complained to Blundell. Blundell told him that he would make it up to Mr. Russo and cover the costs through future trades.

Blundell told Mr. Russo that stocks he was recommending were good, safe investments, but in fact they were speculative, high-risk securities, which Blundell never disclosed. Blundell would constantly quote price expectations for certain stocks and tell Mr. Russo that he had a lot of research information on these companies through his contacts. Mr. Russo questioned Blundell regarding most of these stocks that he never heard of before. Blundell told Mr. Russo that they were safe investments. He stressed to Mr. Russo that he had to take advantage of the surge in the technology sector and that he didn't want him to miss the boat by not investing in these companies.

Blundell made no effort to diversify despite his duty to do so, especially for the Plan's account. He invested in almost 100% equities. The securities purchased by Blundell were penny

stocks and speculative securities. These were securities such as Busybox.com, a stock in which Barron Chase was a lead underwriter for the IPO. Blundell made promises to Mr. Russo that this stock would reach a target price of $75. Not only was this a speculative security, but Mr. Russo had to pay a mark-up on it, which Blundell had not mentioned. Blundell never disclosed that this was a high-risk investment, nor did he disclose the special lucrative financial incentive Blundell had for himself in getting his customers to invest in this stock. Mr. Russo lost $41,602 on this stock alone. Another unsuitable investment was Manchester Equipment. Blundell stated that this stock would reach a target price of $30. Mr. Russo tried to sell this stock on several occasions, but Blundell refused. Mr. Russo ultimately lost $48,548 on this stock. In addition, there were speculative securities such as E-Machines, Corel, Elcom and Focus Enhancements. Mr. Russo lost $51,718, $27,431, $37,256 and $31,815 respectively on these stocks.

Blundell also purchased several Unit Investment Trusts, mostly for the Plan. These were investments were not suitable for the Plan. They were unmanaged investments primarily comprised of technology and telecommunications equities. Mr. Russo lost $164,592 on these investments.

### 3. Churning

In a clear indication that the account was being churned, trading frequency in the account increased dramatically in July 1999 when Blundell took over the accounts at Barron Chase. The average annual turnover rate for the main account (account # 71100887) was almost 5. In addition, there were many periods in which the turnover was significantly higher, including September 30, 2000 to December 31, 2001 when the turnover rate was 9 in the main account.

With such excessive trading, nobody was going to profit from the account other than the Respondents. As a result of the churning, the Respondents received substantial commissions and fees while Mr. Russo lost the vast majority of what he had invested. In account # 71100887, the Respondents collected $73,780 in commissions, for a commission to equity rate of approximately 12%. Adding in margin interest, the Respondents' abuse of the account resulted in an annualized cost to equity ratio of over 15%, i.e. the account would have to earn over 15% annually just to break even, just to cover the cost of margin interest and commissions.

### 4.    Unauthorized Trades

In addition to unsuitability and churning, there were numerous unauthorized trades in the account. Mr. Russo instructed Blundell that he wanted to be contacted prior to all trades. Although Mr. Russo spoke often with Blundell, Blundell frequently did not fully disclose information to Mr. Russo regarding proposed, potential or anticipated transactions. On the occasions when Blundell did mention certain possible investments in advance, he would be ambiguous in discussing proposed transactions and would not inform Mr. Russo when and if certain purchases and sales would take place. Blundell would often call Mr. Russo after the trades occurred. In several instances, Blundell never told Mr. Russo about a trade, especially when they involved margin or option trading.

One of the examples of unauthorized trades in the accounts was Palm, Inc., which Blundell purchased on 12/18/00 without Mr. Russo's authorization. Blundell and Mr. Russo only talked once about this stock in general terms. They never discussed purchasing the stock, yet the confirmation was marked unsolicited. Mr. Russo realized the transaction occurred after he received his monthly account statement. Blundell had no explanation for him as to why the trade was executed. Mr. Russo lost $4,630 on this unauthorized transaction.

Other unauthorized trades included Elcom International, Inc., Intellidata, and OVM International Holding Corporation. Mr. Russo lost $34,710, $9,158, and $6,860 on these stocks. In addition, there were instances when Mr. Russo discussed purchasing stocks only to find that extra shares were purchased or sold without his authorization or that puts and calls were placed on stocks without his permission. For example, puts and calls were placed on America Online (AOL) and Applied Digital Solutions (ADSX) without Mr. Russo's knowledge or consent.

### 5.    Failure to Follow Instructions

Blundell also failed to follow Mr. Russo's instructions. In one instance, Mr., Russo gave Blundell specific instructions to sell Knight/Trimark Group (NITE) if the price went down to $35. Blundell never sold the stock and the price plummeted well below that value. Another example was Arch Wireless (ARCHHQ.PK). Mr. Russo instructed Blundell to sell this stock when it stood at a profit, but Blundell said no, convinced him not to and the value dropped.

Mr. Russo also gave Blundell instructions to sell Busybox.com in June and July 2000. Mr. Russo instructed Blundell to sell 9,000 shares of BusyBox.com in the main account and 5,000 in the Plan's account. However, only 5,000 shares were sold in the main account and none were sold in the Plan's account. Blundell told Mr. Russo that there had been a problem with the clearing agent Fiserv that prevented these transactions from taking place. In June 2001, Mr. Russo wrote a formal letter of complaint to the National Association of Securities Dealers, Inc. (NASD) regarding these transactions. See copy of letter attached hereto as Exhibit E. Fiserv wrote a letter to the NASD on September 25, 2001 denying responsibility. See copy of Fiserv letter attached hereto as Exhibit F.

When Mr. Russo's account value began falling sharply, he told Blundell to liquidate or put a stop loss on some of his positions. Mr. Russo said that he wanted to convert to cash and open some money market funds. Blundell rejected Mr. Russo's requests and told Mr. Russo that the market would bounce back and recover. Blundell insisted that converting to cash was a big mistake. Furthermore, Blundell informed Mr. Russo that he could only place stop losses on a daily basis and he recommended against do that. Based on Blundell's statements and actions, Mr. Russo was concerned. Mr. Russo requested that Blundell call with him weekly with updates in order to monitor the accounts. Despite promising Mr. Russo that either he or his assistant would call, they did not.

## 6.    Complaints made by Mr. Russo About the Accounts

Mr. Russo has made several complaints regarding problems with his accounts. He sent faxes to Blundell regarding the unauthorized margin, he wrote a formal letter to the NASD regarding the BusyBox.com transactions and he called Blundell on several occasions regarding the suitability of stocks purchased. Mr. Russo became increasingly frustrated with the problems in the accounts and the lack of response by the Respondents. Time and time again, Blundell promised Mr. Russo that he would take care of the problems, but he failed to do so. Mr. Russo finally moved the accounts to another brokerage firm in April 2002.

### III.    THE CLAIMS BROUGHT BY MR. RUSSO

The Respondents' wrongful and unlawful conduct discussed above gives rise to a number of

legal claims that Mr. Russo now brings against the Respondents, including the following:

- a.  Unauthorized use of margin and option trading;
- b.  Unsuitability:
- c.  Failure to follow instructions;
- d.  Churning;
- e.  Breach of Contract;
- f.  Breach of the Covenant of Good Faith and Fair Dealing;
- g.  Breach of Fiduciary Duty;
- h.  Breach of a Broker's Duty of Reasonable Care;
- i.  Breach of a Brokerage's Duty to Supervise and Ensure Compliance;
- j.  Negligent and Intentional Misrepresentation;
- k.  Fraud and Deceit;
- l.  Negligence;
- m.  Clearing firm liability under the Uniform Securities Act 410(b) and M.G.L. 110A(b);
- n.  Violations of various State and Federal Securities Laws, including 15 U.S.C. § 78b, Rule 10(b)(5), 18 U.S.C. § 1961 et seq., Mass. Gen. L. ch. 110A, §§ 101 & 410;
- o.  Violations of State Consumer Protection Laws Prohibiting Deceptive and Unfair Trade Practices, including Mass. Gen. Laws ch. 93A; and
- p.  Violations of the NASD Rules of Fair Practice, NYSE, and American Stock Exchange Rules, including the various "suitability" and "know your customer" rules and prohibitions against churning and charging excessive commissions.

In addition, Respondents Federal Street and Salomon are liable for the wrongful acts and

conduct of its employees as a statutory control person and under the doctrine of *respondeat*

*superior*. A number of these specific legal claims are addressed in more detail below.

### A.    Violations of Federal Securities Laws and Anti-Fraud Provisions

The Respondents' exploitation of Mr. Russo's assets violated the federal statutes and

regulations prohibiting securities fraud, including the Securities Exchange Act of 1934 and the rules

and regulations promulgated thereunder.   Section 10(b) of the 1934 Act prohibits the use of

manipulative or deceptive devices in connection with the purchase or sale of any security.

Rule 10b-5 under the 1934 Act makes it unlawful for any person, directly or indirectly:

1.    To employ any device, scheme or artifice to defraud,

2.    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

3.    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of a security.

Section 10(b) and Rule 10b-5 also have a scienter requirement, which is satisfied where a defendant acts with intent to deceive, manipulate or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976). Recklessness is sufficient to satisfy the scienter requirement. Van De Velde v. Coopers & Lybrand, 899 F. Supp. 731, 734 (D. Mass. 1995); Kehr v. Smith Barney Harris Upham & Co., 736 F.2d 1283, 1286 (9th Cir. 1984).

In this case, the Respondents clearly intended to deceive Mr. Russo or, at the very least, certainly were reckless in dealing with Mr. Russo and his accounts. There is also no question that Mr. Russo relied on Blundell's untrue and fraudulent statements in connection with the purchase and sale of securities, the misrepresentations were material, and Mr. Russo's reliance on the misrepresentations caused his losses. The fraudulent misrepresentations and improper practices of Respondents in connection with Mr. Russo's accounts constitute violations of § 10(b) of the 1934 Act. See Mauriber v. Shearson/American Express, Inc., 567 F. Supp. 1231 (S.D.N.Y. 1983); Clark v. John Lamula Investors, Inc., 583 F.2d 594 (2d Cir. 1978).

The fraudulent misrepresentations and improper recommendations also give rise to control person *respondeat superior* liability for Salomon and Federal Street under § 15 of the 1933 Act and § 20 of the 1934 Act. See Mauriber, 567 F. Supp. at 1238. Salomon and Federal Street's managers and supervisors knew or should have known what was happening with the account. The level of commissions and over-concentration of securities should have generated activity reports specifically so that such problems could be addressed. Instead, Blundell repeatedly assured Mr. Russo that his accounts were fine and that he had Mr. Russo's financial future safely in hand. No one from the firms followed up with Mr. Russo to verify that he understood and approved of the activity in his accounts.

## B.    Violations of State Anti-Fraud Securities Laws

Because the Respondents conducted business and sold securities to Mr. Russo in Massachusetts, their actions were subject to the Massachusetts Uniform Securities Act. Mass. Gen. Laws ch. 110A. Massachusetts securities laws prohibit fraudulent actions, such as the actions of Respondents in connection with Mr. Russo's accounts, as follows:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly

1. to employ any device, scheme, or artifice to defraud;

2. to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

3. to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Mass. Gen. Laws ch. 110A, § 101. Massachusetts General Laws chapter 110A "is derived from and is to be coordinated with" the federal securities laws, Cabot Corp. v. Baddour, 477 N.E.2d 399, 401 (Mass. 1985), and the anti-fraud provisions set forth above in particular follow the provisions of federal Rule 10b-5 exactly.

The Respondents' misrepresentations and deceptive practices set forth above constitute violations of the Massachusetts securities laws. Section 410 of Mass. Gen. Laws ch. 110A provides that any person who offers or sells a security by means of any untrue statement is liable to the person buying the security. The Respondents violated Section 410 through their false representations, material omissions and deception of Mr. Russo. See Abelson v. Strong, 644 F. Supp. 524, 531-32 (D. Mass. 1986) (negligence suffices to support liability under § 410; fraudulent intent is not required).

The anti-fraud provisions of the Massachusetts securities laws explicitly provide a defrauded customer with a private right of action to redress such violations of law, for which Respondents are thus liable to Mr. Russo. Mass. Gen. Laws ch. 110A, § 410. In addition to providing for a private right of action for damages, Section 410 also provides for interest, costs and attorneys' fees for the customer as a matter of right. Mass. Gen. Laws ch. 110A, § 410(a)(2).

## C.    Common Law Fraud and Deceit

The specific elements of the common law action for fraud and deceit are that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his detriment. *Lama Holding Co. v Smith Barney Inc.*, 88 N.Y.2d 413 (1996).

Mr. Russo relied on the Respondents' false representations in connection with his accounts. The elements of the common law cause of action for fraud and deceit are present in this case, and Mr. Russo therefore is entitled to compensation for the damages he has suffered as a result.

### D.    Churning

Churning occurs when a broker manages a customer's account and enters into transactions for the purpose of generating commissions and in disregard of the customer's interests. Miley v. Oppenheimer & Co., 637 F.2d 318, 324 (5th Cir. 1981). Churning violates Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Id.; Mihara v. Dean Witter & Co., 814, 619 F.2d, 814, 821. Further, the Policy of the NASD Board of Governor lists churning as among the practices "that clearly violate this responsibility for fair dealing," NASD Conduct Rule 2310(a) (July 1996 ed.). Respondents churned Russo's accounts and are liable for his damages incurred as a result.

The elements of churning consist of the following: (i) control of the account by the broker, either explicit (discretionary trading) or de facto (through acquiescence, trust, or reliance); (ii) excessive trading in the account in light of the customer's investment objectives; and (iii) scienter on the part of the broker. Shad v. Dean Witter Reynolds, Inc. 799 F.2d 525, 529 (9th Cir. 1986); Miley, 637, F. 2d at 324; Mihara, 619 F.2d at 821.

Although Blundell did not have discretionary trading authority over Mr. Russo's accounts, he still maintained "de facto control" of the account, because Mr. Russo was unable to evaluate Blundell's recommendations and to exercise his own independent judgment. See Follansbee v. Davis, Skaggs & Co., Inc., 681 F.2d 673, 676-77 (9th Cir. 1982) (citations omitted). Mr. Russo trusted Blundell and relied on the truth and accuracy of the statements made by him. Mr. Russo seldom rejected any of Blundell's recommendations.

The exceptionally high rate of turnover (the ratio of total purchases divided by the average equity) provides clear evidence of churning in the account. The annualized turnover rate for the main account was nearly five, which means the account was turned over an average of five times per year, i.e. the amount invested in the account was bought and sold and again bought and sold again and again, five times each year. The average period a stock was held was 86 days (not including options).

One of the most practical measures of churning is that cited in <u>Jenny v. Shearson, Hammill & Co., Inc.</u>, 1978 CCH Fed.Sec.L.Rep. ¶94,381 (S.D.N.Y. 1978). That court cited the "Goldberg Cost/Equity Maintenance Factor," which measures the percentage return on the portfolio's equity that would be necessary to simply break even, after broker commissions and other expenses, and declared it be "a more meaningful computation and one more readily comprehensible to investors."

As a result of the churning, the Respondents received substantial commissions and fees while Mr. Russo lost the vast majority of what he had invested. In the main account, Respondents collected $ 73,780 in commissions on the trading, for a commission to equity rate of approximately 12%. Adding in margin interest, the Respondents abuse of the account resulted in an annualized cost to equity ratio of over 15%, i.e. the account would have to earn over 15% annually just to break even, just to cover the cost of margin interest and commissions. Even favorable commission rates would not make up for nor excuse such churning and unauthorized trading. There was no reasonable way that Mr. Russo's accounts could earn a return sufficient to cover such costs of the transactions. With such excessive trading, nobody was going to profit from the accounts other than the Respondents.

Blundell acted with scienter with respect to the excessive trading, having advised Mr. Russo to engage in these securities transactions knowing that his recommendations were unsuitable and contrary to Mr. Russo's investment objectives. <u>See</u> <u>Armstrong v. McAlpin</u>, 699 F.2d 79, 91 (2d. Cir. 1983) (citations omitted) (finding that "[c]hurning, in and of itself, may be a deceptive and manipulative device under section 10(b), the scienter required by section 10(b) being implicit in the nature of the conduct"). Given Mr. Russo's inexperience and objectives, Blundell should have avoided the risks associated with active trading and considered the types of stocks and the sizes of positions in his accounts. Blundell acted willfully and with scienter, and continued his fraudulent activity in order to generate large commissions and fees. Respondents' actions constituted unlawful churning giving rise to Mr. Russo's right to recover his losses.

## E.    Unauthorized Use of Margin and Option Trading

Mr. Russo's accounts were increasingly placed on margin despite the fact that Mr. Russo never indicated to the Respondents that he wanted or needed to purchase stock on margin. Mr.

Russo had never approved the use of the margin trading and, in fact, he had explicitly instructed Blundell that he did not want to borrow any money on his accounts. Mr. Russo had no significant prior experience trading on margin. Based on Mr. Russo's financial circumstances and objectives, the purchase of stock on margin was inappropriate and unnecessary. In addition, the purchase of stock on margin was unauthorized because no margin agreement had been signed. As a result of the unauthorized margin activity, the accounts exceeded margin maintenance limitations on a number of occasions, without Mr. Russo's knowledge. As soon as Mr. Russo started receiving margin calls, he immediately contacted Blundell to demand an explanation.

Mr. Russo's accounts continued on margin for months in spite of his objections. During this time, Russo made several complaints, orally and in writing, to Blundell who was unresponsive to Russo's requests to rectify the problem. The Respondents made substantial profits in margin interest and lucrative commissions while Mr. Russo's account value plummeted. The Respondents collected $16,014 in interest and $97,844 commissions on the accounts, while the accounts were losing $661,948 during the same period.

In addition to unauthorized margin trading, Blundell engaged in unauthorized options trading. Blundell did not explain the risks associated with this type of trading, nor did he have Mr. Russo sign the option agreement as required under NASD regulations.

### F.    Respondents' Violations of Suitability Regulations Constitute a Breach of Contract and the Covenant of Good Faith and Fair Dealing

In opening his accounts at Salomon and Federal Street, Mr. Russo entered contractual arrangements with the Respondents whereby the Respondents agreed, among other things, to properly handle Mr. Russo's accounts in accordance with federal and state securities laws, NASD regulations and securities industry standards, and to provide suitable and appropriate investments in line with Mr. Russo's investment goals, instructions and expectations. As part of the contractual relationship between Mr. Russo and the Respondents, all parties implicitly agreed to treat each other fairly and meet their responsibilities in the relationship. Indeed, as members of the National Association of Securities Dealers, Inc., Respondents promised to abide by member rules and regulations and the basic rules of the industry and its various regulators when performing their

duties as advisers. The Respondents repeatedly and blatantly breached these basic rules in their dealings with Mr. Russo, and as discussed below, thereby breached their customer agreement with Mr. Russo as well.

In addition to the above contractual provisions, a covenant of good faith and fair dealing inheres in any such contract. At a minimum, that covenant holds brokers to the standards of the industry, as evidenced by the rules of the Securities Exchange Commission, the NASD, and the New York Stock Exchange (which Respondents Salomon Federal Street is subject to by terms of their contract). Consequently, an investor is entitled to assume that the performance of the adviser in giving advice and counseling will conform with the basic norms and standards of the industry. This principle is affirmed by case law. See, e.g., Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981); and Mihara v. Dean Witter & Co., 619 F.2d 814, 820 (9th Cir. 1980) stating that "[t]he admission of testimony relating to [NASD and NYSE] rules . . . is proper precisely because the rules reflect the standard to which all brokers are held."

Two basic rules of the profession set forth in the NASD Conduct Rules as well as the rules of the New York Stock Exchange, are the closely related rules of "suitability" and "know your customer." The former states:

> In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

NASD Rule 2310(a), Recommendations to Customers (Suitability).

The "know your customer" rule supplements the suitability rule by forbidding a broker and his firm from ignoring the financial situation, level of sophistication, experience and needs of each customer. This requirement is active and ongoing throughout the relationship. The "know your customer" rule provides as follows:

> Every member organization is required . . . to use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization . . .

NYSE Rule 405(1).

The "suitability" rule charges a broker with the affirmative obligation to seek out information about his client's financial and tax status, and their investment objective, in order to match this background with an appropriate course of trading or investment. See Cruse v. Equitable Securities of New York, 678 F. Supp. 1023, 1031-32 (S.D.N.Y. 1987) (customer stated claim for unsuitability where broker executed high risk investment strategy despite customer's expressed conservative investment objective). In our case, Blundell engaged in exactly such prohibited conduct recommending and implementing a high-risk strategy, which clearly was unsuitable for Mr. Russo and the Plan and in disregard of the investment objectives outlined when Blundell took over the accounts at Barron Chase. Such conduct by Blundell not only was a breach of contract, but also breached Blundell's duty of care. Rolf v. Blyth Eastman Dillon & Co., Inc., 424 F. Supp. 1021, 1042 (S.D.N.Y. 1977) (NASD rules establish a broker's duty of care).

The Respondents breached their contract with Mr. Russo by abusing his accounts for their own profit. From the outset, the Respondents' dealt unfairly with Mr. Russo and in bad faith. The Respondents were aware of Russo's investment objectives. Rather than recommending a balanced portfolio in diversified quality investments or mutual funds focused on long-term growth, the Respondents took advantage of this trusting and inexperienced investor and loaded the account with short-term, speculative trading on margin. In short, the Respondents have not lived up to the agreements between the parties but, instead, made empty promises to Mr. Russo in order to facilitate their exploitation of his accounts. Russo is therefore entitled to recover the losses he has suffered.

## G.    Violations of Massachusetts Consumer Protection Act

The Respondents' wrongful conduct and actions also violated the Massachusetts Unfair and Deceptive Trade Practice Act, Mass. Gen. Laws ch. 93A, which provides damages to those injured as a result of "unfair or deceptive acts or practices" in the conduct of any trade or commerce, including securities transactions. This broad remedial statute exists precisely for situations such as this case where consumers have been abused and exploited by the dishonest and deceptive practices of those in business.

H.    Breach of Fiduciary Duty

Broker-client relations, where a relationship of trust and confidence exists, are recognized as being fiduciary in nature. Opper v. Hancock Securities Corp., 250 F. Supp. 668 (S.D.N.Y.), aff'd, 367 F. 2d 157 (2d Cir. 1966) (per curiam); Bosio v. Norbay Securities, Inc., 599 F. Supp. 1563 (E.D.N.Y. 1985) ("a broker owes a fiduciary duty to its client"); Patsos v. First Albany Corp., 741 N.E.2d 841, 848 (Mass. 2001) (fiduciary obligations arise where there is a "full relation of principal and broker"). "[T]he duties of a securities broker are, if anything, more stringent than those imposed by general agency law." Opper, 250 F. Supp. at 676. Because of this special relationship of trust and confidence, the Respondents were duty-bound to treat Russo with the utmost good faith and loyalty.

In this case, Mr. Russo was relying on the Respondents for their advice and expertise and the Respondents carried fiduciary obligations to him as a customer. Respondents mishandled the account by failing to diversify Mr. Russo's portfolio into different investment areas. The account was over-concentrated in speculative securities that unnecessarily subjected Mr. Russo to increased levels of risk without Blundell disclosing this risk to Mr. Russo. Blundell's overall investment strategy and practices were deceptive and unsuitable in light of Mr. Russo's investment objectives and acceptable levels of risk. Blundell informed Mr. Russo that the stocks he recommended were conservative with a minimal downside. Mr. Russo's suggested to Blundell on several occasions that he wanted to liquidate the account when the stock values began to drop, however Blundell refused.

The Respondents breached their fiduciary duty by trading in the account without authorization, churning the account for their own profit, failing to follow their client's instructions, and by not taking steps to stop losses in the account.

I.    Negligent Management of Russo's Account

The Respondents' gross negligence in this case also constituted a breach of their duty of due care. Stockbrokers owe a duty to their clients to provide service that a reasonable professional broker would provide. Hanly v. S.E.C., 415 F.2d 589, 595-6 (2d Cir. 1969). A breach of fiduciary duty claim and a breach of the duty of care claim may overlap but do not negate one another and

may be grounded on some or all of the same acts or omissions of the broker. <u>Fustok v. Conticommodity Servs., Inc.</u>, 618 F. Supp 1082, 1085 (S.D.N.Y. 1985).

The evaluation of a broker's duty of due care is based on industry standards, <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng</u>, 697 F.Supp. 1224 (D. D.C. 1988), and may include failures of supervision, <u>Vucinich v. Paine, Webber, Jackson & Curtis, Inc.</u>, 803 F.2d 454 (9th Cir. 1986), failure to give notice and exercise reasonable judgment in carrying out the customer's instructions and handling the account, <u>Conway v. Icahn & Co.</u>, 16 F.3d 504, 510 (2d Cir. 1994), making unfounded representations that may induce reliance or a false sense of security, <u>Granite Partners v. Bear Stearns & Co., Inc.</u>, 17 F. Supp 2d 275, 288 (S.D.N.Y. 1998)), and failure to possess a degree of competent skill to perform duties the broker undertakes, <u>Thropp v. Bache Halsey Stuart Shields, Inc.</u>, 650 F.2d 817 (6th Cir, 1981).

Respondents owed a duty of due care to Mr. Russo to manage his accounts as a reasonable stockbroker would. Respondents, however, failed to provide proper advice regarding his accounts. They failed to fulfill industry standards as provided in NASD rules including the suitability rule, they misrepresented and omitted crucial facts that Russo relied on, they made recommendations that were incompatible with Mr. Russo's risk tolerance, financial means and investment goals, and Federal Street failed to supervise Blundell. The gross incompetence and negligence exhibited by Respondents in their mismanagement of Mr. Russo's account amounted to a failure to maintain the reasonable standards of the securities industry, which is a breach of Respondents' duty of due care. This breach over-exposed Russo's account to volatile market forces resulting in a substantial loss of his equity. Mr. Russo, therefore, seeks a remedy for Respondents' negligent handling of his accounts.

### J.    Failure to Supervise; Control Person Liability; *Respondeat Superior*

Salomon and Federal Street's failure to protect Mr. Russo from the abuses perpetrated in the first instance by Blundell constituted active facilitation of broker misconduct. Salomon and Federal Street's failure to supervise and control Blundell's improper activities amounted to an extension and aggravation of those activities.

A brokerage firm has a legal responsibility to protect customers by carefully monitoring and supervising its employees, detecting and preventing employee misconduct, and enforcing their compliance with legal and industry standards for the proper treatment of investors. Salomon and Federal Street ignored this responsibility and abandoned their customer to the inadequately supervised activities of their agent, who wreaked havoc in the account while Salomon and Federal Street looked the other way.

Section 20(a) of the Securities Exchange Act establishes the liability of a "controlling person," such as Salomon and Federal Street, as a matter of law. Salomon and Federal Street's position as a control person under the securities laws is undisputed. Mauriber, 567 F. Supp. at 1238. See also Kravitz v. Pressman, Frohlich & Frost, Inc., 447 F. Supp. 203, 212 (D. Mass. 1978) (in the context of § 20(a), "brokerage firms control their brokers and registered representatives"). In Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990) (en banc), the Court of Appeals held that "a broker-dealer is a controlling person under § 20(a) with respect to its registered representatives." Furthermore, "a plaintiff is not required to show 'culpable participation' to establish that a broker-dealer was a controlling person under § 20(a)." The Court opined:

> [T]he statute premises liability solely on the control relationship subject to the good faith defense . . . . [T]he broker-dealer cannot satisfy its burden of proving good faith merely by saying that it has supervisory procedures in place, and therefore, it has fulfilled its duty to supervise. A broker-dealer can establish the good faith defense only by proving that it maintained and <u>enforced</u> a reasonable and proper system of supervision and internal control.

Id. (emphasis added). New York securities laws similarly provide strict control person liability. N.Y. Gen. Bus. Law § 352-c (McKinney 1984).

Salomon and Federal Street are also vicariously liable to Mr. Russo for Blundell's misconduct under common law agency rules. See In re Atlantic Financial Management, Inc., 784 F.2d 29 (1st Cir. 1986) (principals may be held vicariously liable for securities related misrepresentations of their agents), cert. denied, 481 U.S. 1072 (1987); Hollinger, 914 F.2d at 1576-77 ("§ 20(a) was intended to supplement, and not to supplant, the common law theory of <i>respondeat superior</i> as a basis for liability in securities cases"); Lambergs v. Total Health

Systems, Inc., 1990 U.S. Dist. LEXIS 8554 at *6 (D. Mass. Aug. 8, 1990) ("statutory provision does not preclude the common law theory of liability"); see Kravitz, 447 F. Supp. at 214. In contrast to "control person" liability under securities laws, "common law agency theories, including that of *respondeat superior*, impose liability upon a principal regardless of whether the principal knew or should have known of the violation." Adams v. Hyannis Harborview, Inc., 838 F. Supp. 676, 692 (D. Mass. 1993); see New York Cent. R.R. v. White, 243 U.S. 188, 198 (1917) (under doctrine of *respondeat superior*, there is no good faith defense).

Salomon and Federal Street failed to enforce compliance with securities laws and regulations and failed to put effective procedures in place to regulate the conduct of its brokers. Properly implemented supervisory and compliance systems should have been alerted by the "red flags" present here, including the increasingly heavy use of unauthorized margin accompanied by increasing frequency of excessive trading with decreasing quality, speculative securities, reversals of "errors," and margin violations. Even though Mr. Russo brought these problems to the attention of compliance officials through a series of oral and written complaints, they were not properly addressed. Even more troublesome is the fact that Federal Street should have had heightened supervision of Blundell because of prior complaints filed against him with the National Association of Securities Dealers, Inc. ("NASD") for similar misconduct.

Proper supervision, which could have prevented the damages in this case, was absent, allowing Blundell to do as he pleased at Mr. Russo's expense. Salomon and Federal Street thereby not only permitted, but actually facilitated the wrongdoing in this case, which involved repeated actions over an extended period of time made possible by the lax atmosphere in which Blundell operated as their agent. As a statutory control person, Salomon and Federal Street are strictly liable for the actions of its registered representatives.

## K.    Clearing Firm Liability

The clearing firm, Fiserv, is also liable to Mr. Russo. In July 2000, an arbitration panel ruled that Fiserv as a clearing broker was liable for the acts of the introducing broker under Section 410(b) of the Uniform Securities Act and were ordered to pay claimants $1.8 million in damages. Koruga, et al. v. Fiserv Correspondent Services, Inc. et al., NASD No. 98-04276. See copy attached

hereto as Exhibit G.  This ruling was subsequently upheld by the Court of Appeals for the Ninth Circuit, which ruled that the arbitration panel did not manifestly disregard applicable law when coming to their decision that Fiserv was liable as a clearing firm.  <u>Koruga, et al. v. Fiserv Correspondent Services, Inc. et al.</u>, 2002 U.S. App LEXIS 6439. See copy attached hereto as Exhibit H.

The arbitration panel's decision in <u>Koruga</u> was based Section 410(b) of the Uniform Securities Act (which has been adopted in Massachusetts as M.G.L. ch. 110A(b)) which states in part that:

> Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

Applying section 410(b) to clearing firms, a claimant must prove that the firm was (a) was a broker-dealer; and (b) materially aided the sale.  After that is proven, the burden shifts to the clearing firm to demonstrate that they had no knowledge of the illegal conduct.

Fiserv is a registered broker-dealer with the NASD and NYSE. Furthermore, Fiserv "materially aided the sales" through their actions as a clearing firm.  SEC Rule 382 allows certain brokers who do not meet the minimum financial and other requirements to effect transactions on exchanges by allowing them to enter into "fully disclosed agreements" with clearing firms in which they can specify and allocate their responsibilities. Barron Chase, Salomon Grey and Federal Street (the introducing brokers) all entered into such an agreement with Fiserv in order to execute their customers' transactions.  Under the terms of these agreements, these brokerage firms were required to limit their operations to the "front office" part of the securities business (i.e. opening new accounts, dealing with customers, giving advice as a broker would, etc.).  Meanwhile, Fiserv provided "back office" operations such as executing orders, clearing trades, transferring titles of securities, lending money to buy stocks on margin and mailing confirmations and account statements to customers.  While Rule 382 allows the firms to allocate various functions and

responsibilities, the SEC has stated that "no contractual agreement for the allocation of functions between an introducing and carrying organization can operate to relieve either organization from their respective responsibilities under the Federal Securities laws and applicable SRO Rules." Exchange Act Rule. No. 18497 (Feb. 19, 1982). See In Re. Bear Stearns Sec. Corp., 1999 WL 569554 at 4 (SEC Aug. 5, 1999).

Fiserv played a pivotal role in materially aiding the purchase and sales in Mr. Russo's accounts. Their "back office" operations were essential in allowing these firms to conduct business. Fiserv was not a silent partner. Mr. Russo was aware of their role because of the customer agreement he signed, which outlined their responsibilities. Mr. Russo also received monthly statements, confirmations and margin calls sent by Fiserv.

Having proven that Fiserv was a broker that materially aided the sales and fraudulent activity of Blundell, the burden is on Fiserv to demonstrate they had no knowledge of Blundell's and/or the other Respondents' conduct. Fiserv will not be able to sustain this burden for several reasons. First of all, Fiserv refused to terminate Mr. Russo's contract although they had grounds to do so. Fiserv was on notice that Mr. Russo was trading on margin without a signed agreement. Fiserv sent Mr. Russo a letter on December 8, 2000 informing him that he needed to sign the form and return it by December 29, 2000 in order to trade. Mr. Russo finally signed the form on April 19, 2001, four months after the date requested by Fiserv and about 16 months after the first margin trades occurred.

Fiserv also had first hand knowledge of Mr. Russo's problems in his accounts and failed to take any corrective action. In June 2001, Mr. Russo wrote a formal letter of complaint to the NASD regarding transactions involving Busybox.com that were never executed. Fiserv responded on September 25, 2001. Fiserv's acknowledged that they assisted Blundell execute trades, but they refused to take responsibility for any wrongdoing. Fiserv's letter states that:

> "In our view, Mr. Blundell, as the registered representative for these accounts both during the time period at issue and currently, can *and should* make a good faith attempt to satisfy your concerns despite the fact that Barron Chase is out of business." (emphasis added).