

## U.S. Securities and Exchange Commission

**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C.**

**SECURITIES ACT OF 1933**
**Rel. No. 8436 / July 6, 2004**

**SECURITIES EXCHANGE ACT OF 1934**
**Rel. No. 49970 / July 6, 2004**

**Admin. Proc. File No. 3-10765**

|  |  |
|---|---|
| In the Matter of<br><br>EDGAR B.<br>ALACAN | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

OPINION OF THE COMMISSION

BROKER-DEALER PROCEEDING

CEASE-AND-DESIST PROCEEDING

*Ground for Remedial Action*

Fraud in the Offer and Sale of Securities

Salesperson of registered broker-dealer engaged in unauthorized and unsuitable trading in customer accounts. *Held*, it is in the public interest to bar salesperson from association with a broker or dealer; order salesperson to cease and desist from committing or causing any violation or future violation of Section 17(a) of the Securities Act of 1933 or Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder; and order salesperson to pay civil money penalty and disgorge illegal profits, plus interest.

**APPEARANCES:**

> *Norman B. Arnoff* for Edgar B. Alacan, with *David E. Robbins*, of Kaufman Feiner Yamin Gildin & Robbins, LLP, of counsel.

> *Kathryn A. Pyszka, Charles J. Kerstetter*, and *Joy M. Boddie*, for the Division of Enforcement.

Appeal filed: November 12, 2003



EXHIBIT
E

Briefing completed: February 23, 2004

Oral argument: June 15, 2004

I.

Edgar B. Alacan, a former registered representative of J.W. Barclay & Co., Inc. ("Barclay" or the "Firm"), a former broker-dealer, appeals from a decision by an administrative law judge. [1] The law judge found that Alacan willfully violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Exchange Act Rule 10b-5 through unauthorized trading, unsuitable trading, churning, and failures to follow customers' instructions in connection with his handling of the accounts of certain of his customers during 1997 and 1998. [2] The law judge barred Alacan from association with any broker or dealer; ordered Alacan to cease and desist from committing or causing any violation or future violation of Section 17(a) of the Securities Act or Section 10(b) of the Exchange Act and Rule 10b-5; and ordered him to pay a civil moneypenalty and to disgorge illegal profits, plus interest. We base our findings on an independent review of the record, except with respect to those findings not challenged on appeal.

II.

UNAUTHORIZED TRADING

A. Facts

*Louis Kerlikowske Trust Account* Kerlikowske, who was in his mid-70s and had been retired for close to 20 years at the time of the trading at issue, was dependent for living expenses on his investments. He opened his account in April 1997 based on a telephone solicitation from a Barclay salesman other than Alacan, with the purchase of 200 shares of stock of Conseco Inc.

Barclay subsequently reassigned Kerlikowske's account to Alacan, one of the Firm's top producers. [3] Shortly thereafter, while Kerlikowske and his wife were on an "extended motor home tour" and unreachable, Alacan executed a series of unauthorized trades in Kerlikowske's account. Between August 6 and August 29, 1997, Alacan sold the account's 200 shares of Conseco and purchased 2,000 shares of Digital Data Networks, Inc. and 1,000 shares of Orbit/FR, Inc. In doing so, Alacan created a margin debt for the account of roughly $30,000.

Upon his return home, Kerlikowske learned of the unauthorized activity in his account and immediately complained to Alacan. As well as not authorizing these particular trades, Kerlikowske was uninterested in, and had not authorized, margin trading in his Barclay account. He told Alacan that he wanted the trades reversed so that the account held nothing but the Conseco stock Kerlikowske originally had purchased. Alacan told Kerlikowske that he would "take care of it," but failed to do so. Eventually, in December 1997, after Kerlikowske contacted the Firm's compliance officer, the trades were reversed.

*Max and Rika Knopf* Max Knopf, a German immigrant in his 70s during the period at issue, testified that, during 1997, Alacan engaged in a series of

unauthorized trades in the Barclay account he owned with his wife. [4] After learning of these trades, Knopf sent letters of complaint to Barclay and NASD and, at the end of 1997, closed his Barclay account. [5]

*William Lassiter, Jr.* Lassiter, a commercial real estate developer born in 1929, opened his Barclay account in about April 1998 in response to a telephone solicitation from Alacan. Shortly thereafter, Lassiter testified, Alacan executed a series of unauthorized trades in Lassiter's account. Lassiter stated that he "left town for two weeks in May [1998] . . . and when [he] got back [he] found that Alacan had purchased 3 or $400,000 worth of stock to [sic] my account unbeknownst to me and without my approval." [6] Following his return at the end of May, Lassiter wrote to Alacan to demand that the two unauthorized purchases be cancelled and that the commission Alacan charged on the American Express sale, $2,500, be returned to him, which was done. [7] Later in 1998, Lassiter transferred his account to another firm.

*William M. Latimer, Jr.* Latimer, a yacht salesman and former commercial airline pilot, opened his Barclay account in 1996. Alacan did not open the account, but assumed responsibility for it within a year of its opening. Latimer testified about two purchases by Alacan which Latimer asserted were not authorized. [8] On August 16, 1997, Latimer sent Alacan a memorandum in which he stated, among other things, "I've asked you repeatedly to tell me or check before you sold or bought anything -- then I get these 4 tickets. What happened?" [9] Latimer also testified about a September 1998 unauthorized purchase of 10,000 Hungarian Broadcasting shares. [10] Asserting that he "refuse[d] to go along with any more unauthorized trades," Latimer demanded that Barclay cancel the trade, which the Firm eventually did. [11]

*Joseph Old* Old, who was in his 80s and long retired during the period at issue, opened his Barclay account in 1997 after a telephone solicitation from a salesperson other than Alacan. Alacan assumed responsibility for the account later in 1997.

Old testified that Alacan executed certain trades in Old's account without Old's knowledge or authorization. [12] He testified that he was not aware of the trades until he "got the statement." [13] The record also indicates that Alacan engaged in margin trading in Old's account without authorization. Between December 1997 and June 1998, Old's account carried a margin balance which generated total margin interest for this period of $1,198. Although the record contains a new account form authorizing margin trading in Old's account, Old denied during testimony that the signature was his or that he had ever given such authorization. [14]

Old testified that he complained to Alacan "one time or another," but did not complain to Alacan's supervisors and continued to deposit more money into the account. Old explained that he "assumed that [Barclay] had my best interest and were capable, so I let them go." [15] Eventually, Old stopped trading in the account when the equity was depleted, the account having lost more than $85,000.

*George Wittemyer* Wittemyer, an attorney in his mid-50s during the period

at issue, was a widower with three children in college. Wittemyer had originally opened his account with a salesperson at another firm and then transferred his account toBarclay when that salesperson became associated with the Firm. In March or April 1997, Wittemyer's account was transferred to Alacan. On April 2, 1997, Alacan sold from Wittemyer's account 500 shares of Mellon Bank Corp. and 2,000 shares of Retix, generating proceeds of $43,912, and purchased 10,000 shares of Tellurian for $53,755.

When Wittemyer received the confirmations for these trades, he "immediately got on the phone to Mr. Alacan," and he and Alacan "had harsh words." According to Wittemyer, he told Alacan that "these were unauthorized transactions, that I had never heard of the Tellurians and I certainly didn't want the Mellon sold and I didn't know why he was selling . . . the Retix [which had] been purchased a week or so earlier." Wittemyer then wrote to the firm demanding that the three transactions be cancelled without charge. Barclay eventually reversed the transactions as Wittemyer had demanded, and Wittemyer moved his account to another firm.

G. *Leonard and Cora Beare Trust Account* The Beares, an elderly, retired couple, opened their Barclay account in 1995 based on a telephone solicitation from a Firm salesperson other than Alacan. In September 1998, the account was reassigned to Alacan.

Neither of the Beares testified at the hearing. Cora Beare died in 2002 and Leonard Beare, who was in his 90s and living in an assisted living facility at the time of the hearing, was unable to testify because of his frail physical and mental condition. Instead, the Division presented testimony by the Beare's son-in-law, James Vander Weide, a professor of finance and economics at Duke University. Vander Weide, who was given a power of attorney by the Beares over their Barclay account in September 1999, had ongoing discussions with them regarding the account prior to and following his being given the power of attorney.

Vander Weide testified that Leonard Beare complained to him about "problems" with the account, including unauthorized trading by Alacan. Vander Weide identified documents introduced by the Division as copies of Beare account-related documents (including trade confirmations and margin call notices). These documents contained Leonard Beare's handwritten notes which were consistentwith the information Vander Weide reported concerning Beare's complaints about unauthorized trading. [16]

The record also indicates that Alacan engaged in margin trading in the Beares' account without authorization. Although the record includes a margin trading authorization form containing what purports to be the Beares' undated signatures, the Beares both denied to Vander Weide that these signatures are genuine. Vander Weide testified that Leonard Beare told him "that he had no understanding of what margin trading was," and that, based on his discussions with the Beares, "it was clear [to Vander Weide] that [Leonard Beare] did not understand margin trading." Notwithstanding the Beares' lack of authorization or understanding of margin trading, and despite the fact that they previously had not engaged in margin trading in their account, Alacan caused them to assume significant margin debt beginning almost immediately after he was assigned to it. For the last three months of 1998, the Beares' had margin

debt balances of $62,602, $34,142, and $45,901, respectively.

On August 24, 1999, Leonard Beare and his daughter directed Barclay's operations manager to close the account and liquidate the securities it held. [17] Despite Leonard Beare's direction to close the account, Alacan purchased 1,500 shares of IDT Corp. for $47,000 on September 4, 1999. According to Vander Weide, Leonard Beare told him that Alacan called him after the fact to tell him about the purchase. Beare responded that the account had been closed. Alacan told Beare that he was unaware of the closure, but assured Beare that the stock had already appreciated $6,000, a gain Alacan told Beare he could realize by paying for the trade. Subsequently, Vander Weide, after using his power of attorney to force the closure of the account, learned that there was no profit from the trade, that the stock's price had declined to zero, and that the account had a zero or negative balance. [18]

H. *Sebastian Sollecito* Sollecito, who was in his 90s and needed "around the clock" nursing care at the time of the hearing, did not testify. Instead, the Division presented the testimony of his wife, Susan Sollecito, and documentary evidence to support its allegations.

Susan Sollecito testified that, although her husband was not formally diagnosed with Alzheimer's until November 1998, she began to notice deterioration in his mental condition as early as 1993. By 1995, Sebastian Sollecito was unable to pay the couple's bills as he previously had done. In mid-1996, Susan Sollecito was told by her husband's doctors that he was suffering from "dementia of the Alzheimer's type." She testified that, by 1997, her husband "was afraid to be away from me." [19]

In January 1997, Susan Sollecito wrote to Alacan to inform him that her husband "no longer should be buying/selling in the stock market." [20] Although she did not specifically mention dementia or Alzheimer's disease, she told Alacan that, because her husband "is 83 [and, on] some days . . . more forgetful and fuzzy than on other days," Alacan should not execute "any further transactions in his name . . . [t]o avoid the assumption that his forgetfulness is being taken advantage of . . . ." Notwithstanding this letter, Alacan continued to trade in the Sollecito account.

In late March 1997, Alacan purchased 10,000 shares of Tellurian for $65,005 on Sollecito's behalf. Susan Sollecito learned of the trade when Barclay sought payment. Susan Sollecito testified that her husband said "he didn't order that." The Sollecitos nevertheless agreed to pay for the stock but directed Alacan to resell it.

In early April 1997, following the Tellurian trade, Susan Sollecito urged her husband to transfer his Barclay account to another firm. Sebastian Sollecito agreed and, on April 2, 1997, he executed documents transferring the account. Despite their efforts to transfer the account and notwithstanding that, according to NASD rules, Barclay was required to "freeze" the account following its receipt of transfer instruction, [21] Alacan continued to trade in the account. On April 14, he purchased units issued by Nam Corp for the account. According to Susan Sollecito, her husband denied authorizing the trade. Thereafter, she learned of two additional unauthorized trades that occurred on April 17: a purchase of 1,000 Tellurian shares and sale of

2,000 shares of Trans Global Services Inc. Alacan did not deny responsibility for these trades.

On April 30, 1997, Susan Sollecito wrote to NASD to complain about Alacan's handling of the account. She then contacted the brokerage firm to which the Sollecitos were seeking to transfer the account and learned that a letter, dated April 16, 1997, had been sent rescinding the transfer. Although the letter wassigned "Sebastian Sollecito," Susan Sollecito testified that her husband denied signing the letter and she believed his signature had been forged. [22] On April 25, 1997, Sebastian Sollecito executed a second account transfer form for his Barclay account. Alacan executed yet another trade in the Sollecito account on May 7, 1997, a sale of 2,000 Nam Corp units. On May 12, 1997, Susan Sollecito sent a letter of complaint to Barclay, asking "*Why* are you continuing to buy and sell with this account!?" (emphasis in original), and enclosed a copy of a complaint letter she was sending to NASD. Finally, on May 19, 1997, Barclay transferred the Sollecito account holdings to an account at the new firm the Sollecitos had designated.

B. Analysis

Witness testimony corroborated by contemporaneous complaint letters, memoranda, and notes amply support the conclusion that Alacan purchased and sold securities without authorization in each of the customer accounts discussed above. Alacan also purchased securities for certain of these customers in greater quantities than the customers had authorized and on margin when margin trading had not been authorized.

Unauthorized trading violates the antifraud provisions when it is accompanied by deceptive conduct. [23] "The deceptive conduct element is met when the broker omits 'to inform thecustomer of the materially significant fact of the trade before it is made.'" [24] Here, Alacan failed to inform his customers in advance about his trading in their accounts, the quantity of securities he was purchasing on their behalf, and his use of margin. [25] Alacan acted with scienter in that he was aware that the trading at issue was done without authorization or, at a minimum, was recklessly indifferent to whether his customers had authorized the trades.

The evidence establishes that Alacan's customers did not give him discretionary authority over their accounts. [26] Although Alacan exploited what he presumably perceived to be his customers' inattentiveness to, or inability to appreciate, activity in their accounts, the customers expected to beconsulted by Alacan before each trade and complained when they were not. [27]

Alacan challenges the findings of unauthorized trading in the Beare and Sollecito accounts based on the law judge's decision to admit hearsay evidence related to those accounts offered by Vander Weide and Susan Sollecito. [28] Alacan claims that it was fundamentally unfair and a denial of due process to admit testimony by relatives of the customers regarding Alacan's handling of those accounts when he was denied the opportunity toconfront the customers themselves. [29] According to Alacan, Leonard Beare and Sebastian Sollecito might have admitted to authorizing the

trading at issue had Alacan been able to cross-examine them. He further claims that, although the challenged testimony relates only to the Beare and Sollecito accounts, its admission "infected the entire process," including the law judge's assessment of sanctions.

We reject Alacan's argument that it was improper to admit the testimony of Vander Weide and Susan Sollecito regarding Alacan's handling of their relatives' accounts. As we repeatedly have held, hearsay evidence is admissible in our administrative proceedings and, "in an appropriate case, may even form the sole basis for findings of fact." [30] We evaluate the probative value, reliability, and the fairness of its use by examining, among other things, "the possible bias of the declarant; whether or not the statements are contradicted by direct testimony; the type of hearsay at issue; whether the missing witness was available to testify; and whether or not the hearsay is corroborated." [31]

Consideration of these factors supports the probative and reliable nature of this evidence, and the fairness to Alacan of its use. We consider the evidence probative because it relates directly to whether the customers authorized the trading at issue and, more generally, the nature of the customers' relationships with Alacan and the circumstances surrounding Alacan's handling of their accounts. We also believe that the evidence is reliable. There is no evidence that the testimony of either Vander Weide or Susan Sollecito, which was sworn to before the law judge, was false or biased. [32] Their testimony was not contradicted by anything except Alacan's vague and general testimony, uncredited by the law judge, that Alacan's trading in his customers' accounts was authorized and consistent with the customers' investment objectives. Indeed, Alacan offered very little specific testimony regarding his handling of either the Beare or Sollecito account or that contradicted the testimony of Vander Weide or Susan Sollecito.

Further supporting its reliability is that much of the challenged hearsay testimony was supported by other evidence. [33] The supporting evidence included Vander Weide's testimony, based on personal observation, regarding Leonard Beare's deteriorating mental and physical condition and his own dealings with Alacan. Susan Sollecito similarly provided testimony based on her own personal observations, which was consistent with her other testimony, concerning her husband's mental condition, her interaction with Alacan, and whether her husband rescinded his account transfer. The testimony of both witnesses also was supported by contemporaneously prepared documentary evidence, including Leonard Beare's handwritten notes on account-related documents and the Sollecito's account-related correspondence. Moreover, the picture the challenged evidence paints of Alacan's abusive sales practices is fully consistent with that presented by the testimony of the customers who did testify. [34]

Nor do we believe that there is anything unfair about the use of the challenged hearsay under the circumstances of this case. [35] The Division provided Alacan ample notice before the hearing began that the Division was not calling as witnesses either Leonard Beare or Sebastian Sollecito. Alacan never challenged the Division's evidence regarding these customers' inability to testify. [36] The Division also gave Alacan ample notice that it was planning to call Vander Weide and Susan Sollecito to testify about,

among other matters, the Beares' and Sebastian Sollecito's, respectively, "dealings and communications with Alacan and other Barclay employees . . . ." [37]

## SUITABILITY

We next turn to allegations relating to the suitability of Alacan's recommendations. These allegations were made with respect to the Beare, Knopf, and Old accounts discussed above.

### A. Facts

*Beares* The Beares, who had joint annual income of approximately $50,000, were described by their son-in-law (who had known the family for more than 40 years) as "very frugal" with "a very modest lifestyle." [38] The Beares had a history of making conservative investments. Beginning in the 1950s, according to Vander Weide, Leonard Beare "saved a little bit out of his salary each month and he went to Merrill Lynch and he . . . told them he'd like to invest in the bluest of blue chip stocks." In this way, over time, the Beares invested several hundred thousand dollars in three stocks, Exxon, General Electric, and Sinclair Oil Company, Leonard Beare's employer until his retirement in the 1970s. [39] The Beares' holdings in these stocks represented a large portion of their total net worth.

Notwithstanding their previous conservative approach to investing, Alacan recommended that the Beares purchase what the Division's expert witness, John E. Parkes, characterized as "[h]igh risk securities." [40] Vander Weide testified that Leonard Beare told him that Alacan recommended these securities without providing the Beares any supporting research. Vander Weide confirmed Leonard Beare's assertion subsequently when, after being granted the power of attorney, he was required to review Beare's records. Despite the records being what Vander Weide described as "meticulous . . . there was no research or any documents on any of these stocks in his records."

According to Parkes, "[t]he dynamics in [the Beares'] account over the 104 days in [sic] which Alacan was assigned to it are truly remarkable." Total purchases during this period equaled $796,480 on an average equity of just $32,337 and, in Parkes view, involved an "extremely aggressive" use of margin. [41] Alacan's commissions, of which he received half, totaled $55,441, and the Beares' losses equaled roughly $34,000, realized and unrealized.

In evaluating the level of trading in an account, reference is generally made to the annualized turnover rate, which "is a ratio computed by dividing the aggregate amount of purchases in an account by the average monthly investment. It represents the number of times during a year that the securities in an account are replaced by new securities." [42] Trading activity also frequently is measured by examining an account's break-even level, *i.e.*, "the rate of return on a customer's average net equity required to pay commissions and other expenses before the account begins to show a profit for the customer." [43] Parkes stated that trading in the account, which Alacan admitted was based on his recommendations, generated an annualized account turnover rate of 86.44 times and an annualized break-

even level of 611.89%. Securities were held in the account on average just 15 days.

*Knopf* Knopf, as described above, was in his 70s during the period at issue and had been a self-employed real estate broker for many years. His wife, who co-owned the account, was a housewife and not involved in managing the account. [44] Knopf testified that he told Alacan that he wanted "sound investments which are going to be profitable" and "never" told Alacan that he wanted to speculate. Knopf, who estimated his net worth as between $500,000 and $1 million, described himself as extremely risk adverse.

According to Knopf, Alacan recommended all of the trading in Knopf's account, telling him that the stocks' price, in each case, would rise. Alacan never discussed the issuers' financial conditions or the associated investment risks, and gave Knopf no written research regarding the issuers. Parkes described the recommended stocks as "very speculative . . . excessively highrisk" given Knopf's age, his financial circumstances and his investment objectives. [45]

Alacan also recommended an aggressive level of trading activity, which generated high costs that were difficult to recoup through trading profits. According to Parkes, Alacan purchased for Knopf's account securities totaling $137,016 on average account equity of $38,076, between August and October 1997, generating commissions of $5,268. [46] Such trading resulted in an annualized turnover rate of 8.11 and an annualized break-even level of 31.17%.

*Old* Old had annual income of roughly $60,000 and a total net worth of approximately $1.5 million. At the time he opened his Barclay account, Old's wife was in a residential health care facility, which cost Old several thousand dollars per month. Old's new account form listed his investment objectives as income with moderate growth and long term growth with moderate risk.

Old testified that the trading in his account was based on Alacan's recommendations and that Alacan generally told him that the recommended stock's price would rise. Alacan provided no supporting research and never discussed the recommended issuers' financial condition or the associated investment risks. [47]

Parkes characterized many of the securities Alacan recommended to Old as "high risk, thinly traded securities of a very speculative nature." [48] Parkes also stated that the account had purchases of $252,652 on an average equity of $45,096, which resulted in an annualized turnover rate of 4.94. [49] In addition, the costs associated with the accounttotaled $14,952, which resulted in an annualized breakeven level of 29.23%.

B. Analysis

A salesperson's recommendations "must be suitable for the client in light of the client's investment objectives, as determined by the client's financial situation and needs." [50] While a suitability inquiry frequently focuses on "whether a particular investment product is suitable for an investor," we have held that "the frequency of trading must also be suitable." [51]

Several factors generally are associated with a finding that a salesperson's unsuitable recommendations constitute fraud, and violate the antifraud provisions of the securities laws, including that (i) the recommended securities were, or the level of trading activity was, unsuited to the customer's needs; (ii) the salesperson knew that his recommendations were unsuitable or acted with recklessness regarding their suitability in making them; and (iii) the salesperson made material misrepresentations or failed to disclose material information relating to the suitability of the securities or the level of trading, including the associated risks. [52] These elements are present here.

Although these customers did not seek to speculate, Alacan repeatedly recommended that they purchase securities which expert testimony established were highly speculative. Alacan also recommended that these customers engage in highly risky "in and out" trading, which produced annualized turnover rates ranging from 4.9 to 86.44 and break-even levels ranging from 29.23% to 611%. Such trading activity was excessive in light of these customers' investment objectives. [53] Alacan also increased the risks to Old and the Beares by causing their accounts to purchase securities on margin. [54] Moreover, Alacan made these recommendations without disclosing the associated risks. [55]

The record establishes that Alacan was, at a minimum, recklessly indifferent to whether his highly aggressive and speculative recommendations were consistent with the non-speculative investment objectives of his customers. Alacan took advantage of the fact that these customers were elderly and vulnerable in causing them to make risky investments and trade their accounts at frequencies that were unsuited to their needs. Alacan thereby evidenced the requisite scienter. [56]

*    *    *    *

Accordingly, we find that Alacan willfully violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 by engaging in the conduct described above.

### III.

Alacan asserts that the sanctions imposed by the law judge are excessive. He requests that the Commission "impose lesser sanctions that would not be an associational lifetime bar or the imposition of such a severe monetary penalty." Alacan does not challenge the disgorgement amount ordered by the law judge, which is supported by the record. [57] Alacan already has paid the disgorgement amount, along with the interest ordered by the law judge, which Alacan asks us to consider in mitigation.

The Commission has broad discretion to set sanctions in administrative proceedings. [58] In determining the need to impose sanctions, we are guided by the following factors:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against

future violations, the defendant's recognition of the wrongful
nature of his conduct, and the likelihood that the defendant's
occupation will present opportunities for future violations. [59]

Our consideration of these factors causes us to believe that substantial
sanctions are warranted to protect the public from further abusive
behavior. Alacan defrauded multiple customers over an extended period,
causing significant losses. He repeatedly put his interests ahead of those of
his customers, in contravention of our nation's securities laws and the
obligations owed by a securities professional to his customers.

Alacan's misconduct demonstrated a high degree of scienter. Moreover,
Alacan has shown a prior unwillingness to abide by special supervisory
restrictions. Theo Basis, Barclay's Compliance Director during the period at
issue, recommended Alacan's termination in a 1997 internal memorandum,
observing that Alacan "has shown a blatant disregard to our supervisory
directives . . . ." Basis, who had been an NASD compliance examiner for
several years prior to joining Barclay, testified that Alacan received over
two dozen customer complaints, verbal and written, alleging various
misconduct including unauthorized trading. Following receipt of some of
these complaints, Basis tried but failed to control Alacan through
heightenedsupervision. [60] Basis subsequently concluded that Alacan should
be terminated based on the "[s]heer number of customer complaints [and
his] general lack of attention to compliance-related and regulatory
concerns." [61]

Alacan is currently employed in the securities industry and intends to
remain employed if he is permitted to do so. While he has offered to
participate in continuing education programs and be subject to strict
supervision in the event he is allowed to remain in the industry, the record
establishes that such measures would be inadequate to protect the public.
Under the circumstances, we believe that the public interest warrants that
he be barred from associating in any capacity with a broker or dealer.

We also have concluded that it is necessary to order Alacan to cease and
desist from further violations of the provisions he violated. We have
determined that Alacan engaged in a number of violations over a
significant period of time. His conduct was "egregious," [62] and "raises a
sufficient risk of future violation . . . to warrant issuing a cease and desist
order." [63]Other factors that we previously have identified in considering the
appropriateness of such an order, including the non-isolated nature of the
violations and the respondent's refusal to acknowledge wrongdoing, support
our determination to impose a cease-and-desist order here, as does the
testimony of Basis regarding his unsuccessful efforts to stop Alacan's
misconduct. [64]

In determining whether civil money penalties are in the public interest, "we
examine whether the illegal activities involved, among other acts,
deliberate or reckless disregard of a regulatory requirement; the harm
caused to another person; the extent to which any person was unjustly
enriched; the respondent's prior disciplinary history; deterrence; and other
matters as justice may require." [65] We are authorized to impose a "third
tier" civil penalty of $110,000 per violation [66] where "fraud, deceit,

manipulation, or deliberate or reckless disregard of a regulatory requirement" is involved and the misconduct resulted in or created a significant risk of "substantial losses . . . to other persons or resulted in substantial pecuniary gain to the person who committed the act or omission[s]." [67] Alacan's misconduct, which involved fraud and resulted in substantial losses to his customers and substantial gains to himself, [68] warrants a third tier penalty of $110,000.

Certain of the conduct at issue in this case occurred more than five years prior to the issuance date of the Order Instituting Proceedings ("OIP"), *i.e.*, April 24, 2002, potentially implicating the five-year statute of limitationscontained in 28 U.S.C. Section 2462. [69] We have not considered such conduct in determining to impose a bar and a $110,000 civil penalty, but rather have based these sanctions exclusively on Alacan's conduct during the five-year period preceding the OIP issuance date. [70] A small number of unauthorized trades in the Sollecito account occurred more than five years before the OIP was issued. We have considered these trades, along with the trades that occurred within the five year period, in ordering disgorgement because the statute of limitations does not apply "where the effect of the SEC's action is to restore the *status quo ante*, such as through a proceeding for restitution or disgorgement of ill-gotten profit." [71] Similarly, an order to cease and desist from committing or causing future violations of the federal securities laws is a prospective remedy that is notsubject to the statute of limitations. [72] We therefore have considered conduct outside the five year period in determining to impose a cease-and-desist order. [73]

While we agree with the law judge's decision regarding the proper amount of disgorgement, we disagree with his holding regarding the proper calculation of interest on that amount. [74] The law judge distinguished between what he termed "prejudgement" interest, *i.e.*, interest accruing from the date of the violative activity, and "post-judgement" interest, interest accruing after issuance of the initial decision. [75]

The law judge ordered that Alacan pay prejudgement interest based on the Internal Revenue Service underpayment rate, [76]which fluctuates monthly, through the date of his initial decision. He ordered that thereafter, unless the disgorgement amount is revised on appeal, "post-judgement" interest should be paid based on the rate set forth in 28 U.S.C. § 1961(a). [77] Commission Rule of Practice 600, [78] which governs "interest on sums disgorged," provides for the assessment of prejudgment interest on all funds to be disgorged pursuant to an order of disgorgement, and states that interest should "continue to accrue on all funds owed until they are paid." Rule 600 also requires that interest on the disgorgement be calculated at the IRS underpayment rate and compounded quarterly. Rule 600 does not distinguish between prejudgment and post-judgment interest. We therefore hold that, based on Rule 600, interest shall accrue on the entire disgorgement amount until it is paid, based on the underpayment rate. [79]

An appropriate order will issue. [80]

By the Commission (Chairman DONALDSON and Commissioners
GLASSMAN, GOLDSCHMID, ATKINS, and CAMPOS)

Jonathan G. Katz
Secretary

**UNITED STATES OF AMERICA**
**before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Rel. No. 8436 / July 6, 2004**

**SECURITIES EXCHANGE ACT OF 1934**
**Rel. No. 49970 / July 6, 2004**

**Admin. Proc. File No. 3-10765**

|  |  |
|---|---|
| In the Matter of | : |
| | : |
| EDGAR B. | : |
| ALACAN | : |
| | : |

**ORDER IMPOSING REMEDIAL SANCTIONS**

On the basis of the Commission's opinion issued this day, it

is

ORDERED that Edgar B. Alacan be, and he hereby is, barred from
association with any broker or dealer; and it is further

ORDERED that Edgar B. Alacan cease and desist from committing or
causing any violation and committing or causing any future violation of
Section 17(a) of the Securities Act of 1933, and Section 10(b) of the
Securities Exchange Act of 1934 and Rule 10b-5 thereunder; and it is
further

ORDERED that Edgar B. Alacan disgorge $9,768.16, plus interest
determined in conformity with 26 U.S.C. § 6621(a)(2) and compounded
quarterly; interest shall run on $306.74 of the disgorgement amount from
October 1, 1997, on an additional $374.50 from January 1, 1998, on an
additional $2,340.50 from April 1, 1998, on an additional $4,600 from
October 1, 1998, on an additional $1,521 from January 1, 1999, and on an
additional $625.42 from April 1, 1999, and on the total amount, $9,768.16,
from that date through the last day of the month preceding the month in
which payment is made (Alacan to be given credit for allamounts he
previously has paid towards his disgorgement obligation); and it is further

ORDERED that Edgar B. Alacan pay to the United States Treasury a civil
money penalty of $110,000, pursuant to Section 21B of the Securities
Exchange Act of 1934, within 21 days of the issuance of this Order. Such
payment shall be: (i) made by United States postal money order, certified

check, bank cashier's check, or bank money order; (ii) made payable to the Securities and Exchange Commission; (iii) delivered by hand or courier to the Comptroller, Securities and Exchange Commission, 450 5th Street, N.W., Washington, D.C. 20549; and (iv) submitted under cover letter which identifies the respondent in these proceedings, and the file number of these proceedings. A copy of this cover letter and check shall be sent to Kathryn A. Pyszka, Counsel for the Division of Enforcement.

By the Commission.

Jonathan G. Katz
Secretary

**Endnotes**

---

[1] Alacan, who became associated with Barclay in approximately April 1996, currently is associated with another broker-dealer, Salomon Grey Financial Corporation, where he works with other former Barclay salespersons.

[2] 15 U.S.C. § 77q(a), 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5. Barclay and several other Barclay employees were named as respondents in the Order Instituting Proceedings in this matter. All but one of these other respondents either defaulted, or agreed to findings, without admitting or denying them, that they violated various provisions of the securities laws and to sanctions. *See J.W. Barclay & Co., Inc.*, Securities Exchange Act Rel. Nos. 47496, 47497, 47498 (Mar. 13, 2003), 79 SEC Docket 2837-2848; Exchange Act Rel. No. 47506 (Mar. 14, 2003), 79 SEC Docket 3011; Exchange Act Rel. No. 47544 (Mar. 20, 2003), 79 SEC Docket 3066. An additional Barclay employee consented to a Division of Enforcement (the "Division") motion for partial summary disposition as to findings of violations and to certain sanctions but asserted an inability to pay the disgorgement and civil penalty amounts sought by the Division. The law judge issued an opinion rejecting his claim of inability to pay. *See J. W. Barclay & Co., Inc.*, Init. Dec. Rel. No. 233 (July 23, 2003), 80 SEC Docket 2536. The law judge's decision as to this respondent was not appealed and has become final. *See Mayer Dallal*, Exchange Act Rel. No. 48443 (Sept. 4, 2003), 80 SEC Docket 3727.

[3] Alacan testified that the account was serviced jointly by him and another broker, who had opened the account, but that, according to Alacan, Alacan was the "broker on record."

[4] Max Knopf managed the account on behalf of the couple.

[5] Specifically, Knopf complained about Alacan's purchases of 2,000 shares of stock of Lexington Health Care Group, Inc., 10,000 shares of the Hungarian Broadcasting Co. (when Knopf had authorized the purchase of just 4,000 shares), and 3,000 shares of Tellurian Inc.

[6] Specifically, Lassiter challenged Alacan's purchases of 50,000 shares of Scoop Inc. and 2,000 shares of Dell Computer Corp., and Alacan's sale of 2,000 shares of American Express Co.

7

– According to the Division, Lassiter "ultimately assented to the American Express sale," which was at a price that produced a profit for him.

[8] Specifically, Latimer stated that a purchase of 5,000 shares of Digital Data Networks, Inc. and a 10,000 share purchase of what is referred to on the confirmation as "ECGOF" were unauthorized. Latimer contemporaneously wrote "NotAuthorized" on the confirmation he received for the first unauthorized purchase. Upon receiving a confirmation for the second, Latimer immediately sent the confirmation back to Alacan with the following note: "I told you I can't buy all this . . . ." Similarly, Latimer had no recollection of authorizing an additional purchase of 5,000 shares of Digital Data in July 1997, for roughly $15,000. Contemporaneously, Latimer wrote "Did I buy this?" next to the entry for Digital Data on an account summary prepared by Barclay, which Latimer transmitted back to Alacan.

[9] The record is unclear as to the trades to which Latimer is referring in this memorandum.

[10] In a letter dated October 1, 1998, Latimer complained to Barclay's compliance officer that he was "extremely irritated and frustrated with the unauthorized trade at $8 3/16" because Latimer "did not authorize the purchase at any price higher than $7 per share" and did so "only . . . after being cursed at, yelled at, being called an idiot, being told that $10-$12 per share was *guaranteed* 100% and that there was *no chance* of the stock going down." (emphases in original)

[11] Latimer brought an arbitration proceeding against Alacan and another Barclay employee alleging unsuitable and unauthorized trading and churning. Alacan testified that this proceeding was settled for $45,000 and that he contributed approximately half of that amount.

[12] For example, in May 1998, Alacan purchased, without Old's knowledge, 1,000 shares of American Express Co. stock for $105,000, and approximately 8,000 warrants issued by the Hungarian Broadcasting Corp. for roughly $21,000.

[13] Old testified that the funds to pay for these unauthorized trades came "from cash that [he] had accumulated and it was in the account." Old added that, "in most cases when [he] did send a check" to pay for a trade, he "had received a phone call previous to the buy."

[14] Old further testified that no one at Barclay ever discussed with him the risks associated with margin trading.

[15] While the evidence establishes that Old did not take an active interest in managing his account, it also indicates that Alacan understood that Old expected to be consulted in advance of trades. For example, Alacan testified that trading in the Old account was done based on Alacan's solicitations and that, according to Alacan, "[s]ometimes [Old] did, sometimes he didn't" accept Alacan's recommendations.

[16] For example, on a confirmation for a purchase of 10,000 shares of stock of Euroweb International Corp., dated December 1, 1998, Leonard Beare

wrote, "Authorized no shares to buy. [Barclay compliance official] Josh Chaffey corrects to 2500 shares." Similarly, Leonard Beare wrote on a December 3, 1998 margin notice letter, which directed him to deposit $63,135 or acceptable securities into his account, "will ask that this unauthorized trade *be* stopped . . . ." (emphasis in original) On a December 1998 confirmation for the purchase of 5,000 shares of VDC Communications, Inc. for roughly $19,000, Leonard Beare wrote "ask for office mgr at JW Barclay . . . Complaints Nat Ass of Sec Dealers Sec & Exchange Comm." On a February 1999 confirmation for the purchase of 5,000 shares of stock of Finet Holdings Corp. for $11,095, Leonard Beare wrote: "canceled this but find it already sold" the day following its purchase. Beare further wrote "called Ed Alacan to cancel this and make [clear] no trading for us without specific instructions."

[17] Vander Weide testified that the Beares' daughter assisted Leonard Beare because Beare was "unable" to close the account by himself.

[18] The record indicates that the IDT stock was sold by Barclay on September 20, 1999 for roughly $32,000, or a loss of $15,000.

The Beares subsequently brought an arbitration proceeding against Alacan, which Alacan settled by paying the Beares $50,000.

[19] Susan Sollecito testified that "I couldn't go to the grocery store, I couldn't do anything without him right next to me, sewing classes, et cetera. He was always right next to me." As we discuss below, Sebastian Sollecito's condition makes it highly unlikely that he would have had contact with Barclay of which his wife was unaware.

[20] She initially could not recall whether she discussed her husband's condition with Alacan prior to sending the January 1997 letter, although she "absolutely" recalled such conversations subsequent to the January letter. Because our focus is on Alacan's actions subsequent to January, the extent to which Alacan knew of Sollecito's condition prior to that time is largely irrelevant.

[21] *See* NASD Rule 11870(d), NASD Manual -- Uniform Practice Code at 7952 (1996) (within three days of receiving transfer instruction, carrying member required to validate instruction and "freeze" account or take exception to the instruction).

[22] Alacan claimed that Sebastian Sollecito verbally rescinded the account transfer on several occasions prior to April 16, 1997, but this claim by Alacan was expressly rejected by the law judge as "incredible." Susan Sollecito offered various reasons why her husband could not have signed the letter, including that the two had traveled together out of town on the date on which the letter was purportedly written. In addition, as indicated earlier, she explained that it was inconceivable that her husband could have executed the letter without her knowledge "[b]ecause he was never out of [her] sight. It was like having an 18 month old, be at your knee every second . . . ."

[23] *See Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 678

(11th Cir. 1988); *Brophy v. Redivo*, 725 F.2d 1218, 1220-21 (9th Cir. 1984); *SEC v. Hasho*, 784 F. Supp 1059, 1110 (S.D.N.Y. 1992)(unauthorized trades violate the antifraud provisions of the securities laws when they are the result of, and accompanied by, "deception, misrepresentation or non-disclosure").

[24] *Sandra K. Simpson*, Exchange Act Rel. No. 45923 (May 14, 2002), 77 SEC Docket 1983, 2001-02 (quoting *Donald A. Roche*, 53 S.E.C. 16, 24 (1997)).

[25] *See, e.g.*, *J. Stephen Stout*, Exchange Act Rel. No. 43410 (Oct. 2, 2000), 73 SEC Docket 1441, 1459-60 ("'Purchasing securities on margin in customer accounts without customer approval violates the antifraud provisions of the securities laws.'") (quoting *SEC v. Hasho*, 784 F.Supp. 1059, 1110 (S.D.N.Y. 1992)). We note that a securities purchase that otherwise is authorized can constitute a violation of the antifraud provisions if it is purchased on margin where the customer did not authorize margin trading. *Id.*

[26] Although not raised by Alacan before us, we note that the law judge stated that a "customer's oral grant of general discretion to an account executive [to trade on the customer's behalf] is irrelevant to the analysis of liability" for unauthorized trading. The law judge cited requirements of certain self-regulatory organizations ("SROs") which are enforceable in SRO disciplinary proceedings but do not govern our analysis under the antifraud provisions involved here. A customer's grant of discretionary trading authority, whether written or oral, is relevant to a determination of liability for fraudulent unauthorized trading because it relates to whether the customer was deceived by the salesperson's actions and whether the respondent acted with scienter.

[27] Alacan expressly admitted that he had no agreement with the Beares to engage in discretionary trading in their account.

Alacan asserted before the law judge that certain of his customers accepted or ratified some of the trades at issue after the fact. As we have held, "after the fact 'acceptance' of an unauthorized trade does not transform that transaction into an authorized trade." *Simpson*, 77 SEC Docket at 2002-03. Moreover, we do not believe that the evidence, which includes the facts that certain customers' paid for disputed trades or did not immediately complain and, in some cases, contributed additional funds into their accounts, proves that they approved of Alacan's actions. Evidence indicates that each of the customers complained to Alacan, others at Barclay, or to regulatory authorities, and that any delay in doing so was a consequence of misplaced trust in Alacan, rather than approval of his actions.

[28] Although he does not expressly address in his brief to us the findings of violation as they relate to the remaining customer accounts, *i.e.*, accounts other than the Beare and Sollecito accounts, Alacan seeks to incorporate by reference the factual assertions he made with respect to these accounts in his brief before the law judge. In short, Alacan claimed before the law judge that (i) the customers' assertions of unauthorized trading were false, and motivated by adverse changes in the market, and (ii) his

recommendations and trading in their accounts were consistent with the customers' investment objectives and therefore not unsuitable. The law judge rejected Alacan's assertions based largely on credibility findings he made in favor of the customers and against Alacan. We have found no basis for rejecting the law judge's findings. *See, e.g., Anthony Tricarico*, 51 S.E.C. 457, 460 (1993) (credibility findings overcome only where there is "substantial evidence" for doing so).

[29] At oral argument, Alacan's counsel asserted that a respondent who has been accused of engaging in the kinds of fraudulent sales practices alleged here cannot receive a fair hearing unless the customers are present and available for cross-examination. As discussed below, we reject this assertion.

[30] *Mark James Hankoff*, 50 S.E.C. 1009, 1012 (1992). *See also Wheat, First Securities, Inc.*, Exchange Act Rel. No. 48378 (Aug. 20, 2003), 80 SEC Docket 3406, 3429; *Charles D. Tom*, 50 S.E.C. 1142, 1145 (1992) (admitting hearsay evidence based on finding that it was reliable and probative and where there was no unfairness in its use).

[31] *Hankoff*, 50 S.E.C. at 1012.

[32] Neither witness had a financial incentive to give false testimony since the Division was not seeking disgorgement on behalf of the Beares (who had previously recovered against Alacan in an arbitration proceeding) and was seeking only a small amount of disgorgement, $307, on behalf of the Sollecitos.

[33] *See Carlton Wade Fleming, Jr.*, 52 S.E.C. 409, 411 n.8 (1995) (finding hearsay evidence "sufficiently reliable and probative" where it was "consistent," with respect to material facts, with other non-hearsay evidence).

[34] *See Fleming*, 52 S.E.C. at 411 (noting, in crediting testimony and admitting affidavits, similarities in customers' experiences, as detailed in testimony and affidavits, with salesperson who engaged in unauthorized trading).

[35] While, as we have discussed, the law judge's decision to admit and consider Vander Weide's and Susan Sollecito's testimony was entirely appropriate, we also note that there is significant additional evidence supporting the finding of unauthorized trading in those accounts.

[36] We note that Alacan chose not to subpoena Leonard Beare or Sebastian Sollecito in his own defense. At oral argument, counsel for Alacan, who was not representing Alacan at that earlier stage in the case, stated that he did not know why Alacan failed to subpoena them but speculated that it "may have been a futile exercise [because] they would have been unable to come . . . ."

[37] We note that the law judge made findings that Alacan failed to transfer the Sollecito account to another firm in April 1997. Alacan's refusal to transfer the Sollecito account is related to, and supports, our finding that

Alacan engaged in unauthorized trading in the Sollecito account following the Sollecito transfer request. The law judge also found that Alacan failed to follow instructions to close the Beare account in the fall of 1999. While we believe that Alacan's failures to follow his customers' instructions were deplorable, and relevant to our consideration of Alacan's scienter and assessment of sanctions, we decline to reach the question of whether they provide independent bases for finding that Alacan violated the antifraud provisions.

[38] Vander Weide noted that, despite having a net worth of approximately $1 million, the Beares lived in the same house they had bought for $5,000 when first married in 1938, until moving to an assisted living center shortly after the trading at issue in this case.

[39] Leonard Beare was a chemist with Sinclair from 1933 to the mid-1970s, when he retired.

[40] In Parkes' opinion, the Beares' "circumstances called for low-risk, income-producing investments." Among the stocks in the Beare account that Parkes identified as "high risk" were Euroweb International, Inc., People Soft, Inc., Doubleclick, Inc., and Excite, Inc.

[41] The account had $5,787 in cash and securities at the start of this period and received an additional $83,433 in deposits from the Beares.

[42] *Sandra Simpson*, 77 SEC Docket at 1991 n.16 (citing *Shearson Lehman Hutton Inc.*, 49 S.E.C. 1119, 1122 n.10 (1989)).

[43] *See Simpson*, 77 SEC Docket at 1991 n.17.

[44] *See* n.4, *supra*.

[45] These stocks included Hungarian Broadcasting, Tellurian, and Digital Data.

[46] Knopf deposited $99,161 into his account.

[47] During testimony, Alacan could not recall ever discussing investment objectives with Old but stated that he believed Old sought "to speculate" because that was "the same purpose as all of [Alacan's] accounts."

[48] These include Hungarian Broadcasting, Rockwell Medical Technologies, and Harvey Electronics.

[49] Old deposited $119,227 into his account.

[50] *Stout*, 73 SEC Docket at 1460 n.47 (citing *Donald T. Sheldon*, 51 S.E.C. 59, 74 n.59 (1992) ("[T]he broker has a duty to satisfy himself that speculative investments are suitable for the customer and that the customer understands and is willing to undertake the risks."), *aff'd*, 45 F.3d 1515 (11th Cir. 1995). As we have held, it is "incumbent" on salespersons, "as part of their basic obligation to deal fairly with the investing public, to make only such recommendations as they had reasonable grounds to believe met the customers' expressed needs and objectives." *Richard N.*

*Cea*, 44 S.E.C. 8, 18 (1969). *See also Kenneth Ward*, Exchange Act Rel. No. 47535 (Mar. 19, 2003), 79 SEC Docket 3035, 3057 (salesman violated antifraud provisions based on unsuitable recommendations where salesman failed to disclose associated risks), *aff'd*, 75 Fed. Appx. 320 (5th Cir. 2003); *Laurie Jones Canady*, Exchange Act Rel. No. 41250 (Apr. 5, 1999), 69 SEC Docket 1468, 1482-83 (finding fraud based on salesperson's unsuitable recommendations of securities purchases on margin), *pet. denied*, 230 F.3d 362 (D.C. Cir. 2000).

[51] *Simpson*, 77 SEC Docket at 2004.

[52] *See Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993) (discussing elements of a private unsuitability claim under Exchange Act Section 10(b)). Scienter, according to the Second Circuit, "may be inferred by finding that the defendant knew or reasonably believed that the securities were unsuited to the investor's needs, misrepresented or failed to disclose the unsuitability of the securities, and proceeded to recommend or purchase the securities anyway." *Id.* at 1031.

[53] *See, e.g., Simpson*, 77 SEC Docket at 2004 (finding fraudulently unsuitable recommendations based on annualized turnover rates of 2.10 to 8.09 and annualized break-even rates of 11.98% to 54.95%); *Canady*, 69 SEC Docket at 1476 (finding excessive trading based on turnover rates ranging from 3.83 to 7.28 and breakeven levels of 8.96% to 27.48%).

[54] As we have noted, while margin trading increases the risks to customers it also increases the salesperson's commissions by "permit[ting] the customers to purchase greater amounts of securities, thereby generating increased commissions for" the salesperson, and the potential for abuse. *Stephen Thorlief Rangen*, 52 S.E.C. 1304, 1307-08 (1997).

[55] *See Simpson*, 77 SEC Docket at 2005-06 (finding fraudulently unsuitable recommendations based on margin trading where the customers had conservative investment objectives, modest means, and were ignorant of the associated risks and generally unsophisticated regarding investment matters); *Stout*, 73 SEC Docket at 1461 (finding fraud in connection with unsuitable recommendations based, among other things, on salesman's failure to disclose, to trusting customers,risks associated with margin, and related aggressive trading strategies). *See also Canady*, 69 SEC Docket at 1482 n.27 (finding fraud based on excessive margin trading and noting the associated risks).

[56] In light of our finding that Alacan made fraudulently unsuitable recommendations to the Beares, we decline to reach the question of whether he also churned their account.

[57] The Division introduced an exhibit that showed that Alacan's fraudulent activities generated total commissions of $74,777, and that he received 50% of those commissions or $37,388. The Division introduced a second exhibit which reflected the fact that Alacan had paid out a portion of his commissions in settlements, and listed the amount of his illegal profits now to be disgorged as $9,768.

<sup>58</sup> See, e.g., Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 188-89 (1973) ("The fashioning of an appropriate and reasonable remedy is for the Secretary [of Agriculture], not the court. The court may decide only whether under the pertinent statute and relevant facts, the secretary made 'an allowable judgment in [his] choice of the remedy.'") (quoting Jacob Siegel Co. v. FTC, 327 U.S. 608, 612 (1946)).

<sup>59</sup> Steadman v. SEC, 603 F.2d 1126, 1140 (5th Cir. 1979), aff'd on other grounds, 450 U.S. 91 (1981).

<sup>60</sup> On September 4, 1997, Basis instituted a policy requiring the order tickets of Alacan and certain other salesmen to be signed by Basis prior to submission to the trading desk for execution. According to Basis, Alacan failed to comply with this policy "[t]o a great degree." Alacan testified that, once he was subject to heightened supervision, he continued to receive customer complaints alleging personal misconduct but that the number of complaints "dropped considerably."

<sup>61</sup> On December 1, 1997, Basis wrote a memo to Barclay president Bruno regarding allegations that Alacan had engaged in unauthorized trading in the accounts of three customers other than the customers at issue in this proceeding. Describing Alacan as "an individual who has and will continue to wreak havoc at this firm," Basis recommended Alacan's "immediate termination." In March 1998, Basis fined Alacan $2,000 for unauthorized trading in the account of a deceased client, which was noticed by the client's executor. Basis also renewed his effort to get Alacan terminated at this time.

<sup>62</sup> Geiger v. SEC, 363 F.3d 481, 489 (D.C. Cir. 2004).

<sup>63</sup> KPMG Peat Marwick LLP, Exchange Act Rel. No. 43862, 74 SEC Docket 384, 430, reh'g denied, Exchange Act Rel. No. 44050(Mar. 8, 2001), 74 SEC Docket 1351, pet. denied, 289 F.3d 109 (D.C. Cir. 2002).

<sup>64</sup> See Ward, 79 SEC Docket at 3062 (identifying factors to be considered in imposing cease-and-desist order).

<sup>65</sup> Simpson, 77 SEC Docket at 2010 n.58 (citing 15 U.S.C § 78u-2(c)).

<sup>66</sup> See, e.g., Mark David Anderson, Exchange Act Rel. No. 48352 (Aug. 15, 2003), 80 SEC Docket 3250, 3270-71 (imposing civil money penalties for each violative trade). See 17 C.F.R. § 201.1001 (raising penalty to $110,000).

<sup>67</sup> 15 U.S.C. § 78u-2(b).

<sup>68</sup> See n.67, infra.

<sup>69</sup>Section 2462 states in pertinent part that, "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ."

[70] *See Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996) (applying statute of limitations to Commission proceeding imposing censure and suspension on securities professional).
We also note that certain misconduct occurred in April 1997, slightly prior to the period specified in the OIP, *i.e.*, "from in or about June 1997 through in or about December 1998." We consider the OIP language broad enough to encompass this period, particularly because the Division's Witness List summary, which was provided to Alacan several months before the hearing, gave notice that testimony would be presented regarding the Sollecito and Wittemyer accounts throughout April 1997 (and earlier). We also have considered evidence regarding Alacan's actions after the ending date specified in the OIP, not as a basis for findings of violation, but in assessing the public interest. *See, e.g., Joseph J. Barbato*, 53 S.E.C. 1259, 1282 (1999) (respondent's efforts to influence customer witnesses' testimony considered in setting sanctions). The sanctions we have imposed, however, would be warranted even without a consideration of this later conduct.

[71] *Johnson*, 87 F.3d at 491 (D.C. Cir. 1996).

[72] *See Terence Michael Coxon*, Exchange Act Rel. No. 48385 (Aug. 21, 2003), 80 SEC Docket 3288, 3314 n.60 ("Because a cease and desist order is forward-looking, we believe that Section 2462 does not apply to actions for a cease-and-desist order."), *appeal pending*, No. 03-73732 (9th Cir.).

[73] We note that, while our decision regarding sanctions is based on Alacan's actions with respect to all eight customer accounts at issue, we would still impose these sanctions even if, assuming arguendo, we were to accept Alacan's arguments regarding the Beare and Sollecito accounts and found violations only with respect to the remaining six accounts. In that event, the sole adjustment we would make would be to reduce the disgorgement amount by the commissions charged on the Sollecito trades, $306.74.

[74] Alacan's payment of the disgorgement ordered does not moot the question of the proper amount of disgorgement
because, as discussed *infra*, there is an unresolved issue of the appropriate rate of interest to be assessed on the principal amount.

[75] The law judge suggests that there has been some inconsistency, in Commission proceedings, regarding determination of the interest rate to be applied to disgorgement amounts. As we discuss, interest generally should be assessed based on the underpayment rate. Different results may arise, however, in settled cases as a result of negotiations among the parties. Moreover, in exceptional cases, we may impose a lower rate of interest or no interest at all. *See, e.g., Orlando Joseph Jett*, Exchange Act Rel. No. 49366 (Mar. 5, 2004), __ SEC Docket __, __ n.56 (exercising "equitable discretion" in declining to order prejudgment interest on disgorgement but noting that such interest should be awarded on disgorgement"[e]xcept in the most unique and compelling circumstances"). We also have discretion to fix the date of violation in order to determine the date on which interest begins to accrue.

[76] *See* 26 U.S.C. § 6621(a)(2).

[77] The rate under Section 1961 is equal to the weekly average 1-year constant maturity Treasury yield for the week preceding judgment, 1.29% as of the date of the law judge's decision, compounded annually.

[78] 17 C.F.R. § 201.600(a) and (b).

[79] In *Canady*, we stated that the IRS underpayment rate is applicable to disgorgement amounts for the entire period from the date of assessment until paid. *See Canady, 69 SEC Docket at 1488.*

[80] *We have considered all of the arguments advanced by the parties. We reject or sustain them to the extent that they are inconsistent or in accord with the views expressed herein.*

*http://www.sec.gov/litigation/opinions/33-8436.htm*

*Home  Previous Page*

*Modified: 07/07/2004*